UNITED STATES of America, Plaintiff–Appellant,

v.

Bernard D. REICHER, Defendant–Appellee.

No. 91–2282.

United States Court of Appeals, Tenth Circuit.

Dec. 29, 1992.

John J. Powers, III, Attorney (James F. Rill, Asst. Atty. Gen., Charles A. James, Deputy Asst. Atty. Gen., Catherine G. O'Sullivan, Robert B. Nicholson, John P. Fonte and David Seidman, also Attorneys, Dept. of Justice, Washington, DC, Duncan S. Currie and J. Oliver Lee, Jr., Attorneys, Dept. of Justice, Dallas, TX, with him on the briefs) for plaintiff-appellant.

Teresa E. Storch, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellee.

Before LOGAN, HOLLOWAY and BARRETT, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Bernard D. Reicher was convicted by a jury of conspiring to rig bids in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Although the district court denied defendant's motion for dismissal of the Sherman Act count at the close of all the evidence, it subsequently reversed its position and granted defendant's motion for judgment of acquittal after discharge of the jury pursuant to Fed.R.Crim.P. 29(c). The decision of the district court is reported as *United States v. Reicher*, 777 F.Supp. 901 (D.N.M.1991). The United States has appealed.

■ Reicher was indicted for his participation in a scheme to rig bids for the award of a contract with Los Alamos National Laboratory (the Lab). In 1984, engineers at the Lab became interested in building a specialized structure for laser testing (the Optical Channel Assembly, or OCA), to be assembled from urethane insulated panels. At the time, Reicher's company, B.D. Reicher & Son, Inc., was the regional representative for Bally, one of the major insulated panel manufacturers. Over a period of several months, Reicher and one of his employees worked with engineers at the Lab modifying the OCA specifications to accommodate Bally's standard panel measurements.

In June 1985, Lab officials sent out bid packages to prospective bidders appearing on a list it had compiled. Because the Lab procurement officer had determined that there were numerous companies throughout the country capable of building the OCA from the final specifications, it was decided that the project would be bid competitively. Lab procurement procedure required the submission of at least two bids for the project to be let. However, as the deadline for the submission of bids approached, Reicher learned that his compa-

ny's was likely to be the only bid. Based on his discussions with Lab officials, Reicher believed that if the OCA project were not let in this round of bidding, there would be insufficient time to select a contractor by other means before the end of the year, after which the funds would no longer be available.

So, to insure that the OCA project would be let and that his company would be the successful bidder, Reicher called James Giolas of Giolas Sales Company, another potential bidder appearing on the Lab bid list. Reicher persuaded Giolas to sign a bid form and mail it to Reicher without filling in a quotation. Reicher and one of his employees subsequently completed Giolas' blank bid form and submitted it to the Lab. The Lab awarded the contract to B.D. Reicher & Son as the low bidder.

■ A district court decision "setting aside a jury verdict of guilty is entitled to no deference." *United States v. Hayes Int'l Corp.*, 786 F.2d 1499, 1500 (11th Cir. 1986). We therefore review the sufficiency of the evidence de novo, in a light most favorable to the prosecution. *United States v. Bishop*, 890 F.2d 212, 219 (10th Cir.1989).

Section one of the Sherman Antitrust Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. Despite this broad language, almost from its inception the Sherman Act has been read to prohibit only those restraints of trade that are unreasonable. *Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). However, in addition to this rule of reason the courts have also developed a doctrine of per se violations to cover those business relationships that "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Bid rigging is one such per se violation. *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir.1989), *cert. denied*, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990).

Bid rigging is defined as:

Any agreement between competitors pursuant to which contract offers are to be submitted [to] or withheld from a third party constitutes bid rigging per se violative of 15 U.S.C. section 1.

*Id.* (quoting *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 325 (4th Cir. 1982)). In acquitting Reicher of the antitrust violation, the district court placed particular emphasis on the word "competitors." It found that because the evidence was clear that Giolas' company could not have performed the contract had it won the bid, Giolas was only an "apparent competitor" of Reicher's, and without two companies capable of competing there could be no conspiracy actionable under the antitrust laws. 777 F.Supp. at 905–06. Because we believe the district court's interpretation of the word "competitors" is too narrow, we reverse.

■ Here the decisive circumstance in defining "competitors" is the simple fact that Giolas Sales submitted a bid for the OCA contract. Despite its ultimate inability to perform the contract, Giolas held itself out as a competitor for the purposes of rigging what was supposed to be a competitive bidding process. This is exactly the sort of "threat to the central nervous system of the economy," *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 846 n. 59, 84 L.Ed. 1129 (1940), that the antitrust laws are meant to address. The cases cited by the district court in support of its position do not hold otherwise.

The cases on which Reicher relies most heavily for the proposition that physical incapacity should be an issue in determining competitors in a relevant market are *United States v. Sargent Elec. Co.*, 785 F.2d 1123 (3d Cir.), *cert. denied*, 479 U.S. 819, 107 S.Ct. 82, 93 L.Ed.2d 36 (1986), and

*United States v. Ashland–Warren, Inc.,* 537 F.Supp. 433 (M.D.Tenn.1982). In *Sargent* (a 2 to 1 decision in which each judge wrote separately) the lead opinion stated that the initial inquiry is whether each party to a conspiracy was "an actual or potential competitor in that market" and that "[a]n agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen* [an empty threat]." 785 F.2d at 1127. In *Ashland–Warren* the court stated that "price-fixing by means of bidrigging is flatly impossible when the alleged conspirators are not also competitors.... Unless the offending group consists of competitors, a bidrigging scheme lacks any utility." 537 F.Supp. at 445. The two cases, however, involved whether there were multiple conspiracies; the remarks were made in the context of deciding whether double jeopardy protected against a second conviction for bid rigging in different geographical areas; and in each the defendant was found not entitled to the defense. The cases are distinguishable and we believe, properly construed, are not inconsistent with our holding in the instant case.[1]

Several circuit courts have found antitrust violations when one of the conspirators lacked the capacity to perform the contract. In *United States v. Finis P. Ernest, Inc.,* 509 F.2d 1256 (7th Cir.), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975), the Seventh Circuit concluded there was sufficient evidence to support a conviction for bid rigging when the high bidder prepared its quotation without contacting suppliers or inspecting the work site, and was already committed to other work to the extent of its bonding capacity. *Id.* at 1262. The Fifth Circuit reached a similar result in *United States v. MMR Corp.,* 907 F.2d 489 (5th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1388, 113 L.Ed.2d 445 (1991). In that case, MMR appeared on the relevant bid list but declined to submit a bid in exchange for a subcontract from the bid winner. The court found an antitrust violation even though MMR had never handled such a large project on its own, and even though the job greatly exceeded its bonding capacity. *Id.* at 492, 497.

The Fourth Circuit has also faced a situation similar to the one before us. In *United States v. W.F. Brinkley & Son Constr.*

---

1. In *Sargent,* because a contracting facility would only entertain bids from companies on its bid list, only those companies appearing on the list were capable of rigging the bids for contracts at that facility. Because the facilities all maintained separate bid lists, the court concluded that different conspiracies arose among the bidders at each facility. In effect, the *Sargent* court defined "competitors" for bid rigging purposes according to who the eligible bidders were at each facility. 785 F.2d at 1129. "There is no potential competition between a party not on an approved list of vendors and a party on such a list." *Id.* at 1130. Although the situation here is somewhat different, the *Sargent* court's reasoning implies that when vendors' bids are accepted, they are competitors for antitrust purposes. Unlike the contracting facility in *Sargent,* the Lab in the instant case did not restrict bidding to approved bidders; hence any company submitting a bid became a competitor for purposes of bid rigging analysis. The *Sargent* court appeared to recognize this by its statement that, "[i]f all bidders were on the bid list at each facility ... the court's conclusion that there is a potential for competition at each facility would plainly be permissible." *Id.* at 1129.

*Ashland–Warren* involved highway project bid rigging in Tennessee and Virginia. Because hot asphalt can only be transported a short distance before it must be laid, paving companies are limited in the work they can do by the location of their asphalt plants. Ashland–Warren was the only conspirator in either the Tennessee or Virginia group that had asphalt plants in both states. Because there was no crossover of conspirators between the two groups aside from Ashland–Warren, the court held there were two conspiracies for purposes of double jeopardy. Nevertheless, the physical limitations of hauling asphalt did not conclusively dictate the court's determination of the membership of each conspiracy. Even if a conspiring paving company did not have a plant in the vicinity of a proposed work site, it would obtain a bid proposal and profess interest in the job. Then when a more optimally located co-conspirator tried to negotiate with the other proposal holders and claim the job for itself, it would owe a favor to the bluffer for relinquishing interest in the job. 537 F.Supp. at 439. The bluffer would then agree to bid high, like Giolas did for Reicher, or not bid at all. Thus, within each group, even paving companies that would have been incapable of performing some of the contracts they helped to rig were held liable as conspirators under the antitrust laws.

*Co.*, 783 F.2d 1157 (4th Cir.1986), a bidder on a city sewer project was unable to prepare a competitive bid because one of its subcontractors could not give it an estimate. It decided to submit a bid anyway, so rather than guess an amount it called Brinkley, who was also bidding on the project, for a "safe" number. The court held that at the point Brinkley consented to providing a safe number there was a bid rigging agreement between competitors, even though the high bidder could not have performed the contract. The effect of the agreement was to negate the competitive benefits of sealed bidding. *Id.* at 1160.

■ These cases illustrate that in a bid rigging conspiracy, the determination of a *per se* antitrust violation depends on whether there was an agreement to subvert the competition, not on whether each party to the scam could perform. The Lab was obliged to consider all the bids it received, and entitled to assume that bids actually submitted were bona fide. Had it not received Giolas' bid it necessarily would have changed the OCA specifications in such a way as to obtain competition for a rebidding process, or it would have negotiated a contract with Reicher's company. In a negotiated contract it would have scrutinized the costs in a manner presumed to be unnecessary when there are competitive bids. Thus, notwithstanding Giolas' undisputed incapacity, through their agreement Reicher and Giolas were able to manipulate the bidding and lull the Lab into the belief it had the benefits of true competition. Having bid on the job, and having created the appearance of legitimate competition in an open bidding process, they cannot now escape the inevitable conclusion of dirty dealing by denying that they were competitors.

We therefore REVERSE the district court's grant of defendant's motion for acquittal and order the jury's verdict reinstated. We REMAND for further proceedings consistent with this opinion.