**Charles LOVE and Dry Creek Cattle Company, a Wyoming partnership, Plaintiffs,**

v.

**The BASQUE CARTEL; Steve Adami; Tom Borgialli; Simon Iberlin; Martin S. Harriet; John Iberlin; Lowham Associates, a Wyoming corporation; Paul Lowham; Farmers National Company; Gary Davis; Harriet Bros. Limited Partnership; Mary K. Davis; Harriet Land and Livestock LLC, Defendants.**

No. 94–CV–0109–B.

United States District Court, D. Wyoming.

Jan. 12, 1995.

John P. Worrall, Worland, WY, and Paul F. Lewis, John A. O'Brien, Denver, CO, for plaintiffs.

Philip A. Nicholas, Jeff Anthony, Laramie, WY, for defendants The Basque Cartel, Steve Adami, Tom Borgialli, Simon Iberlin, John Iberlin, Garry Davis, Mary K. Davis.

Frank R. Chapman, Casper, WY, for defendants Martin S. Harriet, and Harriet Land and Livestock LLC.

Dan B. Riggs, Sheridan, WY, and Spencer T. Denison, Denver, CO, for defendants Lowham Associates, Paul Lowham, and Farmers Nat. Co.

Tom C. Toner, Sheridan, WY, for defendant Harriet Bros. Ltd. Partnership.

## ORDER DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

The above-entitled matters having come before the Court upon motions for summary judgment by the plaintiffs and the various defendants, and the Court having reviewed the materials on file herein, having heard the oral arguments of the parties, and being fully advised in the premises, **FINDS** and **ORDERS** as follows:

## INTRODUCTION

This case arises out of the auction sale of more than 90,000 acres comprising the Harriet Ranches near Buffalo, Wyoming. Fortunately, the entire auction was videotaped, and a transcript of the videotape has been prepared. The parties have submitted both the videotape and the transcript as exhibits, as well as an auction brochure which the sellers published prior to the auction. During oral argument on both parties' motions for summary judgment, counsel for the plaintiffs implored the Court to view the tape before ruling on the pending motions. Finding the videotape to be an invaluable record of the hotly contested circumstances surrounding this case, the Court has complied with the plaintiffs' request and invested a considerable amount of time carefully examining both the videotape and its accompanying transcript. After so doing, the Court is able to give the following account of the conduct of the auction.

## THE AUCTION

The auction was preceded by a brochure which served the primary purpose of advertising the sale and describing the property to be sold. The brochure also contained critical language as to the terms of the auction. One of the central provisions of the brochure appeared as follows:

> **Minimum Bid—Absolute Auction:** On receiving the announced minimum bid for each offered ranch property, the auction will then move to an absolute sale with the parcels[1] selling to the highest bidders as acknowledged by the auctioneer. The ranch will be offered in 11 separate ranch units as hereafter outlined and also in its entirety. Sellers will accept that bid or

combination of bids that make up the highest sales price for the total offering.

The brochure then listed the eleven individual parcels, and in bold print listed the minimum bid for each parcel.

The auctioneer also provided the bidders with a memorandum describing the auction procedures. This memorandum stated that the auction would be conducted in four rounds:

> *FIRST ROUND OF BIDDING:* All tracts as catalogued will be offered as individual units. High bids and bid numbers will be posted after each offering.
>
> *SECOND ROUND OF BIDDING:* Bids to advance the bidding will be accepted on individual units or any combination of units you may desire to enter a bid on.
>
> *THIRD ROUND OF BIDDING:* Bids will be received on the ranch in its entirety.
>
> *AUCTION RECESS:* 15 minute recess is scheduled.
>
> *FINAL ROUND OF BIDDING:* The auction will be held open and additional bids received on all individual units, combinations and/or the entirety (beginning at the pre-recess levels) until the auctioneer gives notice of closing the bidding process and sellers acceptance of the bids or combination of bids that result in the highest total sale price for the Harriet Ranches.

The auction was conducted in a common room at the Howard Johnson Crossroads Inn in Buffalo, Wyoming on December 10, 1993. The central figures present at the auction were Paul Lowham and the staff of Lowham Associates, which served as the broker, auction organizer and seller's agent, and auctioneer Monty Meusch and staff, of Farmers National Company. Along one wall were several large erasable ink bulletin boards,

---

1. Throughout their pleadings, plaintiffs' counsel repeatedly omit the letter "s" from the word "parcels" as contained in the auction brochure. This seemingly minor omission transforms the word "parcels" into the singular form, and in so doing significantly bolsters the plaintiffs' argument that the parcels were to be sold individually once they received their minimum price. Had this alteration occurred only once, the Court could easily attribute such an omission to a typographical or clerical error. However, the repeated alteration of this term—and only this term—in numerous pleadings is particularly disturbing. The Court is aware that the plaintiffs' counsel acknowledged this alteration as a "typo" in one of their later pleadings, but only after strenuous objection from the defendants. Plaintiffs' counsel would do well to remember that such conduct, whether intentional or not, succeeds only in injuring their credibility and calls into question the accuracy of the factual statements contained in the remainder of their pleadings.

with the eleven individual parcels listed in the form of headings. As bids were offered on the individual parcels, a member of the auction staff would write in large numbers the current bid on the particular parcel and the number of the bidder who had made the offer. Space was also provided for bids made on the ranch in its entirety.

The auction began with "round one", which involved bidding on the individual parcels. Meusch explained:

> We're going to go through the individual tracts, just as catalogued, Tract 1 through Tract 11. We'll entertain your bids, and hopefully, we'll get minimum bids on all of them, so we're going to bid an absolute auction right off the bat. That would be my—every auctioneer's dream—right, Del [referring to his assistant]—to get into an absolute auction situation. You've got the minimum bids posted in your catalog. You've had good time to do the inspection. I'm sure you're comfortable with the [minimum] bids or you wouldn't be here. We're going to go through the individual tracts. We will have a final bid, total bid posted here; and at that point in time, after we got opening bids on all the tracts, I guess our work and the floor people's work is really going to start. If you would like to put a combination together, if [tracts] 1, 2, 3 makes sense to bid on in a total unit, you can turn a bid in, 1, 2, 3, so many dollars, and the bid number. And certainly, we're going to be asking for that combination

bid, of course, to exceed what we've got on individual tracts.

Auction Transcript, pp. 9–10.

The auction then began with the individual tracts. During the course of the auction, when a parcel reached its minimum bid, the auctioneer would often state "we're having an absolute sale", or in encouraging bids, would state "give me [the minimum bid] and it'll be an absolute auction on Unit 3". Auction Transcript at 20. Such statements might lead the casual listener to conclude that an individual parcel, having attained its minimum, would then sell immediately to the highest bidder. However, the fundamental nature of this multi-tiered auction demonstrates otherwise. First, during rounds one, two and four, even at the close of bidding on a parcel which had received an above-minimum bid the auctioneer never cried "sold" or struck the auction hammer. Instead, the auctioneer simply told one of his assistants to "post the bid" on the erasable ink bulletin board under the heading for that particular parcel, along with the bidder number of the high bidder. This, of course, was required to allow for the possibility that during rounds three and four (which involved the auction of the entire ranch), a single whole-ranch bid might be offered which exceeded the total of the qualifying minimum bids for the individual parcels. These statements as to "absolute sale" were thus conditioned in two obvious ways: first, on the assumption that all of the individual parcels would attain their minimum reserves[2], and second, on the assump-

---

**2.** As discussed *infra,* the proposition that *all* the parcels had to reach their individual minimum bids in order for *any* of the parcels to sell individually is supported by the auction brochure as explained by Paul Lowham and Monty Meusch during the course of the auction. These statements were made before any of the posted bids had been accepted:

> MR. MEUSCH: $3.96 million bid on the ranch in its entirely, and that is the lead bid today. If I was to say "Sold" now, that's the way the property's going to sell. We're going to go through—I talked to Paul. I think we're going to give everybody the opportunity to look at individual tracts. I think we got some people wanting to acquire individual tracts. *You just have to realize that we got some minimum bids that have to be obtained to do that.* 3.96 is buying the total unit.
>
> MR. LOWHAM: Let me kind of add to what Monty has said, is that to avoid any potential

confusion. The lead bid is—we have one bid for the entire ranch property, 3,960,000. Is that right, Tim?

> SPEAKER: Correct.
>
> MR. LOWHAM: Now, [certain amounts] previously have been bid on individual units. If you add up the total of what has been bid on the individual units, they, in effect, might slightly exceed [the amount bid on the entire ranch]. *The problem with it is the Harriet Family has set minimum bids on the individual tract. They will not sell a tract for less than the minimum price that has been [set]. They will not do that. And that's—that's the seller's prerogative. They thought about it a long time. They set the minimums and they're not willing to set—sell below the minimums.*

Auction Transcript, pp. 47–48. (Emphasis added).

tion that the total of the individual bids would exceed any bids offered for the entire ranch.

As the auction proceeded from bidding on the individual tracts to the ranch in its entirety, two of the individual parcels had not yet reached their minimum reserves. Parcel 3, with a reserve of $375,000, received a final bid of $305,000, and Parcel 11, with a reserve of $635,000, received a final bid of $500,000. In accordance with the auction procedure memorandum, even after making the transition to the auction of the entire ranch, the auctioneer repeatedly returned to the individual parcels in an attempt to attain their reserve prices. For example, after soliciting bids on the entire ranch, the auctioneer returned several times to Parcels 3 and 11:

> And working with Tim here on Unit 3. Bidder number 22, why don't you give me 375,000 [the minimum bid]. We'll see what does, but that'll at least put that one to the minimum. 375,000 from bidder 22. Tim, why don't you talk to him right back there. Give me 375,000. That'll put it to a minimum. We'll see how that competes against the total. 375.
>
> Unit Number 11 is still way behind. We got 500,000 offered. We are needing 635,-000 on that tract. Somebody wants to give 635,000 on Unit 11, that'll sure help the bid, and the individual bidding process. If somebody wants to increase their own bids right now, let us know. We got a couple minutes here to go.

Auction Transcript, pp. 56, 57.

As the auction drew to a close, the auctioneer made his final pleas for further bidding:

> Ladies and gentlemen, I think we got maybe about one minute left, but in about 60 seconds, the ranch, we do have some potential increased here [sic]. The high bid is still in the entirety. It will be accepted, and we will be selling the ranch right at that point, unless somebody wants to get involved in the bidding real quick here.
>
> Tim, I'm going to give—I'm going to put the clock on for a minute. Right now. No advances. We're going to put it in the bank at 3.96 [million]. We definitely need

some help on Tract 3. Bidder Number 22, you can give me 75,000, 375,000.

> Need some help on Tract 11. Need a bunch of help on that. 365 minimum.
>
> Bidder Number 22. Give me 375,000 on Tract Number 3. 375 would you. Give me 375,000. 375....
>
> We got about 15 seconds. About 15 seconds. You bet. If somebody wants to give us $4 million on the entirety, do it quick. We're down to about 15 seconds. $4 million on the total ranch, would you. Give me $4 million.... Anybody want to do it? We're down to the last point, Paul. $4 million. Here we go guys. Give me $4 million. $4 million.
>
> Ladies and gentlemen, we have sold the ranch in its entirety for $3.96 million. We appreciate each and every one of you coming here today.

Auction Transcript, pp. 57, 58.

### THE AFTERMATH

Plaintiff Dry Creek Cattle Co. offered the high bid on Parcel 5, bidding $270,000. This amount was $71,000 over the minimum bid. Plaintiff Charles Love, represented at the auction by his sister Christy Love, offered the high bid on Parcel 10, bidding $845,000, which was equal to the minimum bid. Defendant Steve Adami offered the high bid on the entire ranch and eventually prevailed as the successful buyer.

The plaintiffs claim that when added together, the bids on the eleven separate parcels were the high bid for the entire ranch, and that the individual bidders should thus have been awarded their corresponding parcels. In their calculation of the total sum bid, the plaintiffs include the amounts bid on the two parcels which did not reach their minimums. This method of calculation produces a total of $4,035,000. The defendants, on the other hand, excluded these below-minimum bids in totalling the bids on the separate parcels. Under the defendants' method of calculation, Adami bid $730,000 more than the separate parcel bidders.

The plaintiffs also allege that Defendants Adami, Borgialli, Harriet, Simon Iberlin, and John Iberlin met prior to the auction, agreed

to work together to bid on the property as a single unit, conspired not to bid against each other and agreed that Adami would bid on their behalf. According to the plaintiffs, at the request of the Adami group, Lowham and Farmers National made a public announcement that Adami's bid would prevail over the separate bids for the parcels, even though the aggregate of these bids exceeded Adami's bid for ranch in its entirety.

The plaintiffs claim that Harriet Bros., Lowham Associates., and Farmers National accepted Adami's lesser bid and awarded the sale to him in direct contradiction to the terms of the auction. The plaintiffs assert claims under the Sherman Antitrust Act, 15 U.S.C. § 1, alleging that several of the defendants rigged the bidding procedure and suppressed competition at the auction. In addition, the plaintiffs bring actions against the various defendants based on state law claims, including breach of contract, tortious interference with contract, civil conspiracy and negligence. The plaintiffs also request equitable and declaratory relief.

Plaintiff Dry Creek Cattle Co. filed suit individually in the Johnson County, Wyoming, District Court on January 14, 1994, against Harriet Bros. Ltd. Partnership, Lowham Associates, Farmers National, Monty Meusch (the auctioneer), and Garry Davis (a purchaser of property at the auction) for breach of contract, declaratory relief and equitable relief. The parties filed cross motions for summary judgment in the state action. On June 2, 1994 the State District Court granted the defendants' motion for summary judgment. The plaintiffs then filed suit in this Court, identifying several new causes of action, chief among them the federal claim alleging violations of the Sherman Antitrust Act.

The defendants have filed various motions to dismiss with this Court. The Court heard argument on these motions on August 19, 1994. On October 17, the Court issued an Order converting these motions to dismiss into motions for summary judgment. In the same order, the Court dismissed *Dry Creek's* (as opposed to Love's) claims for breach of contract and equitable relief on grounds of *res judicata.* The plaintiffs have filed motions for partial summary judgment against the Basque Cartel, Martin S. Harriet and Garry Davis on the plaintiffs' anti-trust claims, against Harriet Brothers on their contract action, against all the defendants respecting interpretation of the auction rules and against Lowham and Farmers for negligence. The defendants have responded to a number of these motions and have also filed motions for summary judgment of their own. For the reasons discussed below, the Court agrees with the arguments submitted by the defendants and grants summary judgment in their favor on all of the claims advanced by the plaintiffs.

### STANDARD OF REVIEW FOR SUMMARY JUDGMENT

The standard of review for summary judgment is well-established and need not be recited in great detail here. *See Central Wyoming Law Assoc's, P.C. v. Denhardt,* 836 F.Supp. 793, 798 (D.Wyo.1993) (Brimmer, J.); *White v. Continental General Ins. Co.,* 831 F.Supp. 1545, 1551–52 (D.Wyo.1993) (Brimmer, J.). "By its very terms, [the Rule 56(c)] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510; *see also Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir.1987). Summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Carey,* 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement

570

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey*, 812 F.2d at 623. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Moya v. U.S.*, 35 F.3d 501, 503 (10th Cir.1994).

## THE LAW OF AUCTIONS IN WYOMING

The primary authority on the law of real estate auctions in Wyoming is *Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541 (Wyo. 1980). While *Pitchfork* dealt with the "no-reserve" auction of a Wyoming ranch, the case also discussed the law surrounding "with reserve" auctions, which of course, applies to the instant case.[3] *Pitchfork* drew liberally from both 7A C.J.S. *Auctions and Auctioneers* and 7 Am.Jur.2d *Auctions and Auctioneers*. Accordingly, the Court will rely on these sources of authority in discussing the law of auctions.

■ The legal definition of an auction is a public sale of property to the highest bidder. *Pitchfork*, 615 P.2d 541 at 546-47. The underlying purpose of an auction sale is to obtain the best financial returns for the owner of the property offered, and free and fair competition among bidders is seen as the critical element in assuring that the owner realizes such a return. *Id., citing* 7A C.J.S. *Auction & Auctioneers* § 2 (1980). Hence, any agreement unfairly restrictive of the opportunity to freely bid is against public policy and is void. *Pitchfork*, 615 P.2d at 547, citing 7 Am.Jur.2d *Auctions and Auctioneers*, § 1 (1980).

■ The owner of the property offered for sale has the right to prescribe the manner, conditions and terms of the sale. *Pitchfork*, 615 P.2d at 553, *United States v. Blair*, 193 F.2d 557, 560 (10th Cir.1952).

■ A buyer may rely upon the announced terms and conditions of an auction and the buyer is likewise bound thereby. Implicit in this statement is its reciprocal—that if the buyer is entitled to rely on the terms of the auction, then the seller is also bound by the terms which he has set. 7A C.J.S. *Auction & Auctioneers* § 9b (1980), *citing Kivett v. Owyhee County*, 58 Idaho 372, 74 P.2d 87 (1937). However, the courts differ as to the effect of parol modifications made by the auctioneer which are in conflict with the printed terms and conditions of the auction. 7 Am.Jur.2d *Auctions and Auctioneers* § 15 (1980). The general rule seems to be that the printed conditions of an auction may not be modified by the auctioneer at the time of the auction. 7A C.J.S. *Auction & Auctioneers* § 9b (1980), *citing Kivett v. Owyhee County*, 58 Idaho 372, 74 P.2d 87 (1937), 7 Am.Jur.2d *Auctions and Auctioneers* § 15 (1980). Some courts hold that the advertisement or advance announcement has no significance except to announce that a sale has been set. This approach was cited with approval by the Wyoming Supreme Court in *Pitchfork*, 615 P.2d 541 at 547.[4] *See also* 7 Am.Jur.2d *Auctions and Auctioneers*, § 16 (1980), *citing Anderson v. Wisconsin C.R. Co.*, 107 Minn. 296, 120 N.W. 39 (1909), *Moore v. Berry*, 40 Tenn.App. 1, 288 S.W.2d 465 (1955). Still other courts have held that declarations of the auctioneer subsequent to and at variance with the advertised procedures cannot change the printed terms of such advertisements unless the purchaser has knowledge of the modification. 7 Am. Jur.2d *Auctions and Auctioneers* § 15 (1980). Even in the face of this divergent authority, there seems to be no doubt that oral declarations made at the time of auction which are not repugnant to or inconsistent with the advertised procedures but which merely explain the auction procedures are permissible:

Generally, printed conditions under which an auction sale proceeds are binding on both buyer and seller, and cannot be varied by verbal statements of the auctioneer made at the time of sale, although they

---

3. See *infra* note 6 and accompanying text.

4. Unfortunately for us, the Wyoming Supreme Court discussed this aspect of auction law not in the context of enforcing auction procedures but in the context of when the contract for sale is consummated in a "with reserve" auction. Thus, it would be inaccurate to assume that Wyoming law falls within the category that ignores the validity of auction procedures which are published prior to an auction.

may be so explained. Thus, an auctioneer may, at the time of the sale, explain the meaning of advertisements published before the sale.

7A C.J.S. *Auction & Auctioneers* § 9b (1980). *See also* 7 Am.Jur.2d *Auctions and Auctioneers* § 15 (1980).

■ Of course, any discussion of the binding nature of auction conditions and procedures must be counterpoised with the following quote from *Pitchfork*, which offers instruction on the nature of "with reserve" auctions in the context of offers to sell and buy:

> When an auctioneer presents an article for sale at auction and asks for bids, he is ordinarily not making an operative offer and creates no power of acceptance. Instead, he is asking for offers to be made to him; and the bids made in response thereto are themselves offers that can be revoked by the bidders prior to the acceptance by the auctioneer ... the seller or his representative is as free to reject the bids, highest to lowest, as are the bidders to withdraw them. The seller may at any time withdraw the article from sale, if he has not already accepted a bid. He need give no reasons; indeed, he rejects all bids by merely failing to receive them—by doing nothing at all.

*Pitchfork*, 615 P.2d 541 at 548.

Thus, regardless of auction procedures, the basic nature of the "with reserve" auction dictates that a seller has no contractual relationship with the individual bidders until the seller accepts the bidder's offer. Speaking on this subject, the Wyoming Supreme Court stated:

> Acceptance of a bid is denoted by the fall of the hammer, or by any other audible or visible means signifying to the bidder that he is entitled to the property on paying the amount of his bid according to the terms of the sale. Once a bid has been accepted, the parties occupy the same relation toward each other as exists between promisor and promisee in an executory contract of sale conventionally made. Thereafter, as a rule, the seller has no right to accept a higher bid, nor may the buyer withdraw his bid.

*State v. State Board of School Land Comm'rs*, 191 P. 1073, 1075 (1920).

Finally, on the issue of bid rigging or bid chilling, 7A C.J.S. *Auction & Auctioneers* § 14 (1980) states:

> Generally, any act of the auctioneer, or of the party selling, or of third parties as purchasers, which prevents a fair, free, and open sale, or which diminishes competition and stifles or chills the sale, is contrary to public policy and vitiates the sale. Thus, a sale will be set aside where a person, desirous of purchasing, prevents others by his improper conduct from bidding against him; but a mere attempt of a purchaser to prevent another person from bidding will not render the sale invalid, if such attempt has not been successful.
>
> It has been broadly held that prospective bidders at a public sale cannot fraudulently agree to refrain from bidding against the other, and that to do so renders the sale to any one of the confederates void. More particularly, sales which are affected by combinations of interests or agreements not to bid are voidable by the seller, if the purpose thereof is to chill the sale and purchase property for less than its market value.....

*Id.*

## INTERPRETATION OF THE AUCTION RULES

As mentioned above, the owner of property offered for sale at auction has the right to prescribe the manner, conditions, and terms of the sale. Having set the terms of the sale, the seller is generally obligated to observe such terms in the conduct of the auction. Based on the above, the Court will focus its attention at this point not on whether the defendant sellers had the right to establish the auction procedures—which they clearly did—but on what the procedures actually where.

■ Much of the controversy in this case can be settled as a matter of law based on the auction rules. Predictably, the issue of rule interpretation is hotly contested. Notwithstanding the voluminous arguments filed

by the parties, the dispositive questions which must be answered by an analysis of the auction rules are refreshingly simple: did the auction rules require the sellers to award a parcel to the highest bidder, even though that parcel did not attain its minimum advertised bid? If so, did the auction rules require the seller to compare the aggregate of the individual bids, including below minimum bids, with the entirety bid to determine the winner at the auction?

The answer to these questions can be found within the four corners of the auction brochure. In relevant part, the brochure stated:

> **Minimum Bid—Absolute Auction:** On receiving the announced minimum bid for each offered ranch property, the auction will then move to an absolute sale with the parcels selling to the highest bidders as acknowledged by the auctioneer. The ranch will be offered in 11 separate ranch units as hereafter outlined and also in its entirety. Sellers will accept that bid or combination of bids that make up the highest sales price of the total offering.

■ The phrase "on receiving the *announced minimum bid* for *each* offered ranch property, the auction will *then* move to an absolute sale with the *parcels* selling to the highest bidder" unambiguously indicates that receiving a minimum bid on a parcel was a prerequisite to the sale of that parcel. Indeed, according to the most basic auction law, a seller is under no obligation whatsoever to accept a bid below a posted reserve. *See Pitchfork,* 615 P.2d at 548. Moreover, the brochure specifically listed in bold type the minimum bid required for each parcel. If the sellers had no intention of reserving the individual parcels to certain minimum

bids, why then did they post the minimums clearly in the brochure? *A fortiori,* the very title of the auction was "Minimum Bid— Absolute Auction". The Court has difficulty imagining how the seller could have been more clear in requiring individual parcels to attain their reserve as a prerequisite to sale.

Not surprisingly, the plaintiffs are unable to cite even the most distant authority to support their position that a seller is required to sell property at below the minimum posted reserve.[5] Based on the above, this Court rules as a matter of law that the auction rules unambiguously required each parcel to attain its posted reserve as a prerequisite to that parcel's sale to the highest bidder. Accordingly, the Defendant sellers—being free to set the conditions of the auction in the first place—were under no obligation to sell parcels 3 and 11 for less than their posted reserves. This in turn means that the sellers were entitled to omit the below minimum bids in comparing the aggregate of the individual parcel bids to the bid for the ranch in its entirety. To hold otherwise would lead to at least two untenable results.

First, suppose that plaintiffs succeeded in forcing the sellers to include the below minimum bids on parcels 3 and 11 in their calculation of the aggregate bid. The bidders on these two parcels would in essence receive a windfall by being allowed to purchase the parcels at a price below the posted minimum. How would this be explained to the nine other bidders, who in observance of the auction rules bid their individual parcels above the posted minimums, especially when the very amounts bid over reserve on the nine other properties are in reality being used to

5. Plaintiffs make the sweeping statement that "the only reasonable interpretation of the auction rules is the interpretation which gives the seller the most money." Although it can certainly be said that the primary purpose of an auction is to obtain the best financial returns possible for the owner of the property sold, the Court declines to accept the Plaintiff's expansion of this general concept. Certainly, the importance of maximizing financial return must be balanced with the seller's basic right to set the terms and conditions of the auction as he sees fit. The seller at auction may have personal concerns other than attaining maximum price when selling his property. For example, a seller may have a personal desire to see that a piece of real property be auctioned as a single unit, even though a higher price could easily be attained by auctioning off individual pieces. Or, as in the instant case, an owner might be willing to set a minimum bid for the entire ranch which is lower the aggregate of the minimum bids for the individual parcels, if for no other reason to account for the higher transaction costs of conveying the parcels individually.

subsidize the insufficient bids on parcels 3 and 11?

Second, the adoption of plaintiffs' position would clearly chill the bidding at auctions of this nature by encouraging parcel bidders to loiter below the posted minimums under the hope of riding on the coattails of other above-reserve bidders who had driven the aggregate total into rough equivalence with the entirety bid.

 Also important to the disposition of this case in the context of rule interpretation is the doctrine which allows the auctioneer, at the time the sale, to explain the meaning of advertisements published before the sale. These explanations are valid as long as they are not repugnant to or inconsistent with the advertisements. 7A C.J.S. *Auction & Auctioneers* § 9b (1980), 7 Am.Jur.2d *Auctions and Auctioneers* § 15 (1980). In this case, while the bidding was still open on both the individual parcels and the ranch in its entirety and before the auctioneer had accepted any of the bidder's offers, Mr. Lowham made the following announcement:

> If you add up the total of what has been bid on the individual units, they, in effect, might slightly exceed [the amount bid on the entire ranch]. The problem with it is the Harriet Family has set minimum bids on the individual tract. They will not sell a tract for less than the minimum price that has been [set]. They will not do that. And that's—that's the seller's prerogative. They thought about it a long time. They set the minimums and they're not willing to set—sell below the minimums.

Auction Transcript, pp. 47–48.

The Court holds that this statement was consistent with the auction rules as advertised and with the conduct of the auction before and after the statement was made. Accordingly, the Court considers this explanation to be a valid and binding statement of the auction rules.

Before leaving this discussion, the Court notes the plaintiffs' emphasis of the last sentence of the "Minimum Bid—Absolute Auction" paragraph discussed above: "Sellers will accept that bid **or combination of bids** that make up the highest sales price of the total offering" (emphasis added). Casual examination of this phrase in isolation, especially the phrase "combination of bids", might lend credence to the plaintiffs' argument that the rules required the sellers to add all bids—including below minimum bids—together in making the determination as to the high bid for the total offering. The question accordingly becomes: by using the phrase "combination of bids", did the seller intend to accept a combination of bids both above and below the minimum reserve?

As an initial matter, an affirmative answer to this question would render the Court's ruling that the sellers were under no obligation to sell any parcel below the posted minimum completely meaningless. Furthermore, plaintiffs' interpretation annuls the clear provisions of the auction brochure which set minimum bids for each parcel, as well as the explanation of the auction rules as given at the auction. It would thus be unreasonable to adopt the plaintiffs' interpretation at the expense of the minimum bid provisions where an alternate interpretation would give effect to all the provisions of brochure. What then, did the phrase "combination of bids" mean? Fortunately, the brochure and the memorandum of auction procedures answer this question. In addition to offering the property as eleven separate parcels and in its entirety, the sellers offered combinations of parcels. The brochure stated:

> The entire ranch will be offered at auction and the owners have agreed to accept a minimum bid of $3,870,000 for the entire ranch. The ranch will also be offered in 11 separate units ... Additionally, the TW ranch [Parcels 4 and 5] will be offered as one unit with a minimum bid of $450,000 and the 5 Powder River Ranches [Parcels 7, 8, 9, 10, 11] will be offered as one unit with a minimum bid of $2,360,000.00.

The memorandum of auction procedures stated:

> *SECOND ROUND OF BIDDING:* Bids to advance the bidding will be accepted on individual units *or any combination of units* you may desire to enter a bid on.

(Emphasis added). Based on the above, the phrase "combination of bids" refers to bids on combinations of individual parcels, not

combinations of above and below-reserve bids. This view is supported by the following explanation given by the auctioneer at the beginning of the auction:

> If you would like to put a combination together, if [tracts] 1, 2, 3 makes sense to bid on in a total unit, you can turn a bid in, 1, 2, 3, so many dollars, and the bid number. And certainly, we're going to be asking for that combination bid, of course, to exceed what we've got on individual tracts.

Auction Transcript, p. 10.

A logical reading of the "combination of bids" language thus does not support the plaintiffs' foundational contention that the seller was required by the terms of the auction to accept below minimum bids or parcels 3 and 11 or to include these below minimum bids in the aggregate parcel calculation.

### THE NEGLIGENCE CLAIM

█ Plaintiffs argue that "if the seller's interpretation of the auction rules are correct, Meusch and Lowham were negligent toward the bidders by drafting the rules in such a way that they affirmatively mislead bidders into believing that they would able to be competitive at the auction simply by bidding aggressively on the individual parcels in which they were interested." Plaintiffs' Consolidated Motions for Partial Summary Judgment, p. 25.

The critical question posed by the plaintiffs' negligence claim thus becomes: did the auction rules mislead the bidders into believing that they would be able to be competitive by simply bidding on the individual parcels?

As discussed above, the Court has ruled as a matter of law that the auction rules were unambiguous, and that the sellers had no obligation to sell a parcel for below the posted minimum. The auction rules, including the memorandum of auction procedures, absolutely and unequivocally established that the individual parcels bidders would be competing not only against each other but also

against bidders for the entire ranch. Announcements made at the auction in accordance with this rule and the basic conduct of the auction itself establish without question that a reasonable bidder knew or should have known that his individual parcel bid was simply an unaccepted offer pending the outcome of bids for the ranch in its entirety. A simple reading of the rules establishes that even if all of the parcels had attained their posted minimums, the aggregate of the individual bids would have been meaningless in the face of a higher bid for the ranch in its entirety. Thus, a bidder would have to completely ignore both the auction rules, the explanatory statements given at the auction and the very nature of the auction itself to believe that he was guaranteed to be competitive by simply bidding on individual parcels. Because no genuine dispute exists as to the interpretation of the auction rules, or to the fact that all bidders knew or should have known their bids were simply offers pending the final bids for the ranch in its entirety, summary judgment for the defendants of the issue of negligence must be granted.

### BREACH OF CONTRACT AGAINST HARRIET BROTHERS

█ Plaintiff Love correctly characterizes the auction in accordance with its title, as a "minimum bid—absolute auction". However, Love attempts to apply this term in a way which is repugnant to both the law of auctions and the clear terms of the auction rules. According to Love, in a "minimum bid—absolute auction" the seller loses the liberty to withdraw property from auction once the minimum required bid had been made. Love argues that Harriet Brothers was therefore contractually obligated to sell parcel 10 to him as the high bidder. While this might be true where an auction is advertised *specifically* as no-reserve [6], or where an independent parcel in an "minimum bid-absolute auction" has attained its advertised

---

6. Unless otherwise stated, an auction is presumed to be with reserve:

> In summary, then, the law seems to be settled that in an auction *with* reserves—which seems to include all auctions where the advertisements and preliminary information representa-

tions do not announce the sale to be *without reserves*—the contract is formulated by the offer of the bidder and the acceptance of the seller.

*Pitchfork*, 615 P.2d 541 at 548. (Emphasis in original).

reserve, such was not the case here. No dispute exists that the auction involved bids for individual parcels as well as for the entire ranch. Thus it is clear that all above-minimum bids received on the individual parcels during rounds one and two did not create "collateral contracts" [7], but were mere offers which, in order to prevail, had to exceed bids for the entire ranch which at that point had yet to be made.[8] Accordingly, the sellers were under no contractual obligation to accept these individual parcel bids—if at all—until bids were made on the entire ranch. Furthermore, this Court has already ruled that the sellers were under no obligation to accept bids on parcels which had not attained their minimums, and that they were thus justified in omitting below-minimum bids in their comparison of the aggregate bid to the bids for the entirety. This comparison rendered the nine above-minimum parcel bids, including Love's offer on Parcel 10, insufficient to overcome the entirety bid. No breach of contract occurred in this context. The Court thus finds as a matter of law that Harriet Brothers did not breach a contractual relationship with Plaintiff Love. Accordingly, Defendant Harriet Brothers' motion for summary judgment as to Love's claim for breach of contract will be **GRANTED**.

### THE ANTI–TRUST CLAIM

The gravamen of the plaintiffs' anti-trust claim is that the members of the "Basque Cartel" [9] formed an association with the intent of chilling competitive bidding on the individual parcels. The plaintiffs contend that the Cartel's ultimate purpose was to suppress the aggregate bid for the individual parcels in order to suppress competition between the aggregate bid and the entirety bid, which would allow them to buy the ranch in its entirety for an artificially low price. The plaintiffs assert that such alleged behavior constituted "bid rigging" and was thus a *per se* violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

In relation to the antitrust claim, the Court finds the following uncontested facts dispositive: [10]

1. Four members of the Basque Cartel (Martin Harriet, Steve Adami, Simon Iberlin and John Iberlin) met on December 5, 1993, to discuss the auction, and specifically to discuss parcels 7, 8, 9, 10, and 11, which made up the "Powder River Ranch" in its entirety. In the auction brochure, the sellers offered the Powder River Ranch as a combination unit with a minimum bid of $2,360,000. Each individual at the meeting was interested in a different parcel of the ranch, and none were interested in the same parcel. The intent of the individuals present at the meeting was to discuss the possibility of making a combination or joint bid on the Powder River Ranch.

2. At the meeting, none of the individuals present was interested in Parcel 8. The group decided to contact Tom Borgialli to determine his interest in parcel 8. The attendees scheduled another meeting for December 9, the night before the auction. Borgialli was invited to this meeting and was in attendance. The parties at this meeting understood that the Powder River Ranch would be offered as a combination with its own minimum bid, and each attendee discussed how much he could pay for the individual parcel in which he was interested.

3. Because all of the members of the Basque Cartel were interested in different

---

**7.** Even assuming *arguendo* that a contract was thus formed, Love admits that such "contract" was contingent upon the aggregate of the parcel bids exceeding the entirety bid, which, after excluding below-minimum bids, never happened. See Charles Love's Motion For Partial Summary Judgment With Respect to His Fourth Claim for Relief, p. 14.

**8.** In this regard, witness the fact that the auctioneer never uttered the word "sold" or struck the hammer, even when a parcel had reached its reserve. Instead, the auctioneer simply asked his assistant to "post the bid".

**9.** The plaintiffs refer to a group of the defendants as the "Basque Cartel", alleging that the individuals themselves came up with this name during the course of their dealings with one another. While the name has a certain ominous tone, it is nonetheless a convenient method of identifying this group of defendants. The Court uses the term "Basque Cartel" without necessarily agreeing that it was either.

**10.** These facts are either admitted by both parties in the various pleadings or are uncontested.

parcels, none of its members had reason to bid against each other on an individual parcel basis, whether or not they were members of the Basque Cartel.

4. Members of the Basque Cartel authorized fellow member Steve Adami to submit a joint or combination bid for the Cartel on the Powder River Ranch. Mr. Adami placed such bid, but it did not exceed the posted minimum and was rejected.

5. After the failure of the Powder River bid, Adami submitted a bid for the entire ranch. According to Adami, he believed after observing the progress of the auction that several of the individual parcels would fail to reach their minimums and that pursuant to the auction rules, none of the parcels would be sold individually. Thus, Adami believed that in order to acquire Parcel 7 individually, he would need to buy the entire ranch. Upon making the bid for the ranch in its entirety, Adami became personally liable for the amount bid. Adami intended to sell a number of parcels off after acquiring the ranch.

6. Adami consulted with the Parcel Bidders for Parcels 1–6 during the course of the auction. He made general inquiries about their willingness to purchase individual parcels from him in the event that he prevailed in his bid to purchase the entire ranch.

7. S.F. Curutchet placed a combination bid on Parcels 2 and 3, for around $670,000. Each parcel had a minimum bid of $375,000 for a total minimum of $750,000.[11] A competing bidder raised Curutchet's bid, after which Curutchet bid $690,000. Curutchet avers that at that point he had bid the maximum amount that he was willing to on Parcels 2 and 3. After Curutchet had placed the high bid for these units, Adami, through an intermediary named Mark Iberlin, inquired as to whether Curutchet would pay more for the land. Curutchet responded that he would not. Iberlin then asked whether Curutchet would be willing to purchase ranch units 2 and 3 for his last high bid ($690,000) in the event another party was successful in placing a winning bid on the entire ranch.

11. Curutchet bid the $375,000 on Parcel 2 and

Curutchet stated that he would buy at $690,-000 but for nothing more.

8. The highest bid attained for Parcel 3 was $305,000 offered by Robert Redland. The reserve for Parcel 3 was $375,000.

9. The last high bid for Parcel 11 was $500,000 made by John Iberlin, a member of the Basque Cartel. The reserve for parcel 11 was $635,000.

## BID RIGGING

Section 1 of the Sherman Antitrust Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Despite this broad language, the Sherman Act has been read *ab initio* to prohibit only those restraints on trade which are unreasonable. *U.S. v. Reicher*, 983 F.2d 168, 170 (10th Cir.1992), *cert. denied* —— U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994), *citing Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). However, in addition to the reasonableness rule, the courts have identified certain conduct which because of its "pernicious effect on competition and lack of any redeeming virtue" is considered be a *per se* violation of the Antitrust Act. *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Bid rigging is one such *per se* violation. *Reicher*, 983 F.2d at 170.

Bid rigging is defined as "any agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party...." *U.S. v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir.1989), *cert. denied* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990).

A typical bid-rigging scheme is illustrated by the following hypothetical: suppose the United States Government decides to construct a large office complex and solicits bids for the supply of concrete. Companies A, B and C are the major suppliers of concrete in the region, and they are accordingly notified of the construction and requested to submit

an amount below the minimum on Parcel 3.

bids. Assume that a reasonable price for the quantity of concrete required is roughly $100,000. Companies A, B and C meet and decide among themselves that none will submit a bid below $150,000. They also decide to allow company B to submit the lowest bid of the three. In return for their cooperation in inflating the bids and assigning the contract, B agrees to return the favor to A and/or C on later projects. In an alternative scheme, companies A and B agree not to submit bids at all, allowing company C to set its own price. In return for A and B's cooperation, C agrees not to compete on later projects. These scenarios illustrate a relationship between competitors which blatantly destroys the foundational function of competitive bidding; that is, tempering the universal business objective of profit maximization with the realization that other parties may be willing and able to supply the same service or product for less. An honest bidding procedure works as a powerful tonic to those who suffer from bloated profit expectations and assures the general contractor that he is not lining the pockets of conspiracy on the way to completion of his project.

Bid rigging should not be confused with joint bidding, which allows bidders to pool their resources to place bids on property which they would otherwise be unable to afford. In *Kearney v. Taylor*, 56 U.S. (15 How.) 494, 14 L.Ed. 787 (1854), the Supreme Court stated:

It is true that in every association formed to bid at the sale, and who appoint one of their number to bid in behalf of the company, there is an agreement, express or implied, that no other member will participate in the bidding; and hence, in one sense, it may be said to have the effect to prevent competition. But it by no means necessarily follows that if the association had not been formed, and each member left to bid on his own account, that the competition at the sale would be as strong and efficient as it would by reason of the joint bid for the benefit and upon the responsibility of all. The property at stake

might be beyond the means of the individual, or might absorb more of them than he would desire to invest in the article, or be of a description that a mere capitalist, without practical men as associates, would not wish to encumber himself with … These observations are sufficient to show that the doctrine which would prohibit associations of individuals to bid at the legal public sale of property, as preventing competition however specious in theory, is too narrow and limited for the practical business of life, and would oftentimes lead inevitably to the evil consequences it was intended to avoid. Instead of encouraging competition, it would destroy it. And sales, in many instances, could be effected only after a sacrifice of value, until reduced within the reach of the means of the individual bidders.

*Id.* at 520.

This lucid reasoning, although some 140 years old, has lost none of its power and has been recognized in the context of modern business relationships. *See In re Beck Industries, Inc.* 605 F.2d 624 (2d Cir.1979).

■ After carefully considering the undisputed evidence before it, this Court is convinced that the plaintiffs' attempt to label the defendants' conduct in this case as bid-rigging is legally insupportable. The Court reaches this conclusion for several reasons.

First, both the plaintiffs and the defendants agree that all the bidders at the auction who were a part of the Basque Cartel, including the bidders for parcels 1–6, were interested in different parcels and thus were not competitors as to those parcels. These individuals were accordingly powerless to rig the bidding as to the price of the individual parcels since they lacked a competitor with whom they could collude. Without an illegally cooperative competitor, the plaintiffs' charge of bid-rigging vanishes. The court is keenly aware of the plaintiffs' argument that the cartel members lost the incentive to bid when they were presented the opportunity to buy the property for a set price [12] from Ada-

12. That these bidders were guaranteed a set price is anything but clear. Indeed, the bids on Parcel 4 continued to climb even after Adami contacted its bidders as to the possibility of a post auction purchase. Moreover, Adami's informal agreements with these bidders were contin-

mi after the auction. The plaintiffs argue that this chilled the bidding and allowed Adami and the Basque Cartel to purchase the entire ranch for an artificially low price. The Court rejects this argument, as its adoption would essentially outlaw joint bids of any kind since it could always be said that joint bidding agreements removed potential bidders from the bidder pool and thus suppressed competition. Furthermore, it is undisputed that the sellers purposely structured the auction to encourage combination bidding, and actively encouraged joint bidding as the auction progressed. This leads the Court to the inescapable conclusion that although joint bidding removed potential individual bidders from the sale, the sellers considered such bidding to be an important, if not essential, factor in their success in achieving their minimum posted bids. The Court is in firm agreement with the long-established doctrine that sellers of property at auction—within certain limits not at issue here—are free to set the terms of the auction as they see fit. While bidders at an auction are certainly free to express personal disagreement with a seller's choice of auction procedure, they are not free on that basis alone to set the results of the auction aside.

Second, the plaintiffs have presented no evidence that they or anyone else at the auction were foreclosed from bidding on the ranch in its entirety, or from offering the minimum bids on parcels 3 and 11 in order to establish valid competition between the aggregate bid and the entirety bid. No evidence has been submitted to establish that the bidding on the entire ranch was chilled or suppressed in any way. The plaintiffs' Antitrust claims ring hollow when they fail to present evidence that they were prevented—by anything other than their own lack of financial resources—from competing against Adami for the ranch in its entirety either directly or by submitting qualifying bids on Parcels 3 and 11. The simple truth remains that according to the unambiguous auction rules and the events as they unfolded at the auction, the plaintiffs at all times had a fail safe method for acquiring the parcels they were interested in: they simply had to be the high bidder for the ranch.

Finally, the Court finds that Adami's conduct at the auction is consonant with the Supreme Court's support for joint bidding in *Kearney*, 56 U.S. at 520. The evidence clearly demonstrates that parcels 3 and 11 stood little chance of reaching their reserves, notwithstanding the auctioneer's repeated attempts to raise their bids.[13] The Court has ruled that the sellers were under no obligation to sell any parcel below its posted minimum, and that according to the auction rules as explained at the auction, they were under no obligation to sell any of the parcels unless all of the parcels reached their minimums. With the bidding stalled on parcels 3

---

gent upon him being high bidder for the entire ranch at the close of the auction, which was far from certain.

**13.** The Court anticipates the Plaintiffs' contrary argument that the bidding on Parcels 3 and 11 was chilled by the very anti-competitive conduct of which it has complained throughout its pleadings.

The Court directs the Plaintiffs attention to the fact that the final bid on parcel 3, which was below minimum at the close of the auction, was made by Robert Redland, whom the Plaintiffs do not mention as a member of the conspiracy to bid rig. Based on the clear instructions given at the auction, Redland knew or should have known that his bid was below minimum and thus insufficient to buy the land under any circumstances. Redland's competitor, Mr. Curutchet, has given uncontroverted testimony that he was unwilling to bid more for Parcel 3, and that Iberlin contacted him about a post-auction purchase only after he had already made the decision to stop bidding. What all this amounts to is that Parcel 3 remained below minimum for reasons totally independent of the Plaintiff's theory of bid rigging. With parcel 3 below the minimum, the Defendants had no obligation to sell it nor, according to the auction rules, did they have an obligation to sell any of the other parcels.

The same argument can be made for Parcel 11. If the bidding on Parcel 11 stalled because a Cartel member had no incentive to bid, it stands to reason that the final bidder on the property would be a non-cartel member, and that this bid would have languished below the minimum because of a lack of competing bids which should otherwise have come from the Cartel members. However, the Plaintiff's own records demonstrate that final high bidder for parcel 11 was J. Iberlin, whom they name as a member of the Basque Cartel. The lack of a bids to compete with J. Iberlin indicates to this Court not that the bidding was chilled, but that there was a general lack of bidder interest in Parcel 11.

and 11, it should have been clear to all present that the auction would fail unless someone offered the minimum bid for the entire ranch. Adami stepped in and made such a bid. Based on the uncontroverted facts before it, this Court has little doubt that except for Adami's willingness to take the substantial risk of making a joint bid for the entire ranch, the auction would have ended in a no sale. To declare the auction void at this point based on plaintiffs' ominous accusations of bid rigging and conspiracy would require complete ignorance of the auction rules and the concept of joint bidding, would serve to injure both the buyers and the sellers by declaring void a final sale, and would benefit the plaintiffs in no way whatsoever since the Court has declared as a matter of law that pursuant to the auction rules, the defendant sellers had no obligation to convey Parcels 5 and 10 to the plaintiffs in the first place. Based on the undisputed facts before it, the Court declines the plaintiffs' request to embark on such an adventure and grants summary judgment in favor of the defendants on the plaintiffs' antitrust claim. The Court's ruling also disposes of the plaintiffs' claim against Lowham and Farmers National for aiding and abetting antitrust violations, and their claim for civil conspiracy against all the defendants.

Finally, the Court has ruled that pursuant to the auction rules, the defendants had no contractual duty to the plaintiffs and that the defendants did not engage in improper conduct during the course of the auction. These holdings require summary judgment in defendants' favor on the plaintiffs' remaining claims, including their claims for equitable and declaratory relief, tortious interference with contract, and their request for exemplary damages.

THEREFORE, it is

**ORDERED** that the Plaintiffs' Motions for Summary Judgment be, and the same hereby are, **DENIED.** It is further

**ORDERED** that Defendants' Motions for Summary Judgment be, and the same hereby are, **GRANTED.**