UNITED STATES of America, Appellee,

v.

W.F. BRINKLEY & SON CONSTRUCTION COMPANY, INC. and William F. Brinkley, Jr., Appellants.

No. 84–5355.

United States Court of Appeals, Fourth Circuit.

Argued Aug. 2, 1985.

Decided Feb. 21, 1986.

N. Carlton Tilley, Jr. (William L. Osteen, Osteen, Adams, Tilley & Walker, Greensboro, N.C., on brief), for appellants.

Robert B. Nicholson (John P. Fonte, Charles P. Rule, Acting Asst. Atty. Gen., Washington, D.C., Carl W. Mullis, III, Atlanta, Ga., Bargery G. Williams, on brief), for appellee.

Before PHILLIPS and SNEEDEN, Circuit Judges, and JONES, United States District Judge for the Western District of North Carolina, sitting by designation.

SNEEDEN, Circuit Judge:

The defendants, William F. Brinkley, Jr. and W.F. Brinkley & Son Construction Company ("Brinkley & Son"), appeal their convictions of one count of conspiring to rig bids on a construction project in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Brinkley, president of Brinkley & Son was sentenced to 30 days incarceration and fined $25,000. The company was fined $100,000.

The appellants contend that the trial court erred by denying their motion for judgment of acquittal and by improperly instructing the jury on the definition of bid rigging and on the requisite intent to violate Section 1 of the Sherman Act. Finding no error below, we affirm their convictions.

### I.

This case concerns the 1979 bidding process for a portion of the Pasquotank River Supply Project undertaken by Elizabeth City, North Carolina. For several years Elizabeth City considered the need to supplement its raw water supply, finally concluding that obtaining water from the adjacent Pasquotank River was the best alternative. The overall project was divided into several subprojects, each of which was to be awarded through a competitive bidding process. Contract 12, at issue in this case, involved constructing a pumping station at the river and laying a pipeline system to carry the water to a treatment plant.

Contract 12, along with several other subprojects, was first let for bidding in 1977. The city received bids from Brinkley & Son; Dickerson, Inc. ("Dickerson"); Crain & Denbo, Inc. ("Crain & Denbo"); and Dellinger, Inc.[1] Brinkley & Son was the low bidder with a bid of $653,000. Contract 12 was not awarded in 1977, however, because bids on other projects were significantly higher than expected and the city decided not to award any of the contracts.

In the summer of 1979, Elizabeth City again offered Contract 12 for bidding. Brinkley & Son, Dickerson, and Crain & Denbo submitted bids. Brinkley & Son was again the low bidder—this time with a significantly higher bid of $995,000—and was awarded the contract.

At trial, representatives of both Dickerson and Crain & Denbo testified as immunized witnesses for the government concerning events which preceded the 1979 bidding. Frank Carpenter, the Utility Division manager for Dickerson, testified that he spoke with William Brinkley prior to the bidding and told him that they should try to get the contract together again[2] and that Dickerson would "honor" Brinkley's low bid from 1977. Joint Appendix at 59–60 and 103. Carpenter stated that Brinkley indicated his agreement with that suggestion. Joint Appendix at 60. While Carpenter could not recall the specific wording of his conversation with Brinkley—a point on which he was vigorously cross-examined by defense counsel—he remembered that the substance of the conversation was that

---

1. Prior to the bidding, Brinkley & Son and Dickerson entered into an agreement whereby each company agreed to give the other a subcontract estimate for a portion of Contract 12. Brinkley, which specializes in plant work, gave Dickerson a subcontract price for the pumping station construction; and Dickerson, which specializes in pipeline work, gave Brinkley a price for the pipeline work. While both companies submitted a competitive prime contractor bid on Contract 12, each agreed that if it won the contract it would subcontract the relevant portion to the other company.

2. *See supra* note 1.

Dickerson would intentionally submit a high or "complementary" bid to ensure that Brinkley would again be the low bidder. Joint Appendix at 79. Carpenter further testified that, to the best of his recollection, the amount which Dickerson bid in 1979 for Contract 12 was given to him by Brinkley. Joint Appendix at 73.

Harold Crain, Jr., and Edward Denbo, Jr., of Crain & Denbo, the third company to submit a bid in 1979, also testified. Both Crain and Denbo stated that, on the morning of the day that bids were to be submitted, they telephoned William Brinkley and asked that he give them a "safe" number to bid on Contract 12. Joint Appendix at 165. Both further testified that Brinkley agreed to give them an amount to bid on the project. Joint Appendix at 129–130 and 165. Crain and Denbo indicated that they had originally intended to submit a competitive bid but were unable to complete the bid when a subcontractor failed to give them a price for the pipeline work. Joint Appendix at 145 and 167. Thus, their options at that point were to submit no bid, to guess on an amount, or to obtain a safe number from another contractor. Joint Appendix at 156. They testified that they rejected the alternative of failing to submit a bid because they did not want to offend the project engineer. Joint Appendix at 147. Fearing a costly mistake if they simply guessed on a bid amount, they decided to contact William Brinkley for a safe number to bid.[3] Joint Appendix at 149. Both Crain and Denbo stated during cross-exam-

ination that they decided not to submit a competitive bid prior to discussions with Brinkley. Joint Appendix at 146 and 181.

Gene Greer, an employee of Crain & Denbo, then testified that he went to Brinkley's motel shortly before noon on the day of the bidding and was given an amount to bid by Brinkley. Greer stated that he then filled out a bid, placed it in a sealed envelope, and gave it to Brinkley to turn in for him. Joint Appendix at 185–187. Greer further testified that Brinkley appeared to be working on Brinkley & Son's bid, which was due at 2:00 p.m. that afternoon. Joint Appendix at 185–186.

## II.

The appellants first argue that the district court erred in denying their motion for judgment of acquittal, both at the conclusion of the government's case and at the close of all the evidence, because there was insufficient evidence of an agreement between Crain & Denbo and appellants to rig bids.[4] Pointing out that unilateral action cannot violate Section 1 of the Sherman Act, the appellants argue that there was no agreement to rig bids because Crain and Denbo[5] had decided not to compete for Contract 12 *before* contacting Brinkley.[6] Appellants maintain that Crain & Denbo's decision was thus the result of unilateral action and not the result of a conspiracy involving the appellants. Under the appellants' view, one could never be convicted of bid rigging for simply giving a competitor a safe number to bid once that competitor

---

**3.** Crain and Denbo also testified that, prior to the bidding in 1977, Brinkley contacted them for safe numbers to bid on Contracts 7 and 8 of the Pasquotank River Supply Project. They further testified that they supplied him with those numbers. Joint Appendix at 136 and 170.

**4.** The appellants contend that the general nature of the jury's verdict makes it impossible to tell whether the jury looked to the alleged agreement between Carpenter and Brinkley, the alleged agreement between Crain & Denbo and Brinkley, or both, to support its verdict. The possibility that the jury relied only on the agreement between Crain & Denbo and Brinkley—one which they claim did not exist—gives rise to their argument that the evidence was insuffi-

cient. Without commenting on this contention by the appellants, we address the issue of whether the evidence regarding the conduct of Crain, Denbo and Brinkley is sufficient to support appellants' convictions of bid rigging.

**5.** Of course, a corporation acts through its officers or agents. The use of the conjunctive "and" instead of the ampersand indicates actions by the individuals on behalf of the corporation.

**6.** Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." The necessity of concerted action is apparent on the face of the statute.

had decided for himself not to compete for a particular contract.[7]

■ We agree with appellants' assertion that unilateral action does not violate Section 1, but that is the extent of our agreement with their position. Contrary to the appellant's argument that Crain & Denbo acted unilaterally, the facts of this case clearly demonstrate concerted action by Crain & Denbo and Brinkley on the submission of bids to Elizabeth City. While Crain and Denbo might have decided between themselves not to submit a competitive bid on Contract 12, they went beyond unilateral action when they contacted Brinkley requesting a safe number to bid and he consented to give them one. At that point, there was an agreement between two competitors pursuant to which bids would be submitted to Elizabeth City. Such an agreement is clearly bid rigging. As Judge Russell explained in *United States v. Portsmouth Paving Corp.*, "[a]ny agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party constitutes bid rigging *per se* violative of 15 U.S.C. § 1." 694 F.2d 312, 325 (4th Cir. 1982), (citations omitted).

The appellants would have liability under the Sherman Act turn on the fact that Crain and Denbo decided not to bid competitively for Contract 12 prior to contacting Brinkley. We cannot accept such a proposition. Regardless of which competitor initiated the contact, and regardless of the reason, the agreement between these competitors clearly deprived Elizabeth City of the benefits of a competitive bidding process. By agreeing to give his remaining competitor an amount to bid, Brinkley gained the knowledge that Crain & Denbo would not actually be competing for Contract 12. That knowledge afforded him the opportunity to inflate his bid, confident that he would still be the low bidder.[8] Crain & Denbo received a number which it could submit as a "complementary" or intentionally high bid, thus preserving the appearance of being a legitimate competitor for the contract. The only entity that did not benefit from the arrangement was Elizabeth City, which thought it was awarding the contract for the lowest possible cost.

Moreover, as the government points out in its brief, accepting the appellants' position would lead to self-serving testimony in virtually every bid rigging trial. Brief for Appellee at 20. Rarely would a competitor make anything other than a unilateral decision not to submit a competitive bid.

It is clear that appellants' conduct constituted bid rigging in violation of the antitrust laws and that the evidence in this case is more than sufficient to support the jury's verdict. The district court therefore properly denied appellants' motion for judgment of acquittal.

7. To that end, the appellants requested that the trial court give the following instruction to the jury:

Members of the jury, I instruct you that certain conduct, standing alone, is not a violation of the Sherman Anti-Trust [sic] Act. It is not, for example, a violation—nothing more appearing—for one contractor to give another contractor a price to bid above if so requested when the contractor requesting the price has already determined independently and unilaterally not to compete for the project.

Brief of Appellant at 15. For the reasons set forth below, we find that the district court properly refused to give such an instruction.

8. There is evidence in the record to suggest that Brinkley did indeed inflate his bid. In 1977, Brinkley & Son won Contract 12 with a low bid of $653,000. Two years later, Brinkley & Son won the contract with a bid of $995,000. The project design was not altered between 1977 and 1979. Joint Appendix at 47. Assuming a 23 percent rate of inflation in construction costs— to which the parties stipulated—Brinkley should have adjusted his bid to $803,000. Joint Appendix at 50.

Moreover, Dickerson, to whom Brinkley subcontracted the pipeline work for $555,000, apparently earned a substantial profit on the project. Carpenter testified that while Dickerson normally estimated a profit of 15 percent on such projects, it estimated a 25 percent profit in its 1979 subcontract price to Brinkley because "there was very little competition on the job." Joint Appendix at 79. Carpenter further testified that Dickerson's actual gross profit on the job was 49 percent. Joint Appendix at 78.

## III.

■ The appellants next contend that the trial court erred in its instruction defining bid rigging. This argument need not long detain us. By withdrawing their objection to this portion of the trial court's instructions, Joint Appendix at 229–230, appellants failed to properly preserve this issue on appeal as required by Rule 30 of the Federal Rules of Criminal Procedure. Appellants now assert, as they must, that the trial court's instruction defining bid rigging constituted plain error. They suggest that the district court should have told the jury that "[b]id rigging is an agreement between two or more persons to eliminate, reduce, or interfere with competition for a job that is to be awarded on the basis of bids."[9] Brief of Appellants at 19. However, we find the district court did not err in providing the following instruction:

> Under the law, a conspiracy to allocate projects or rig bids is automatically or per se unreasonable and illegal. Therefore, where two or more persons agree that one will submit a bid for a project higher or lower than the others or that one will not submit a bid at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act.

Joint Appendix at 221. The above instruction, read in conjunction with the remainder of the court's instructions, is an accurate statement of the law and a proper definition of bid rigging.

## IV.

The appellants' final argument also focuses on alleged inaccuracies in the instructions given by the district court. The appellants contend that the court committed reversible error in its instructions concerning the intent required to violate the Sherman Act. The district court instructed the jury, in relevant part, as follows:

> The crime charged in this case requires proof of intent before the defendants can

be convicted. To establish the required intent, the government must prove beyond a reasonable doubt that the defendants knowingly did something which the law forbids. In this case, that means that the government must prove beyond a reasonable doubt that the defendants formed, joined or participated in a combination or conspiracy to allocate the project charged in the indictment or to submit collusive and non-competitive bids on the project.

> Moreover, the *Government must also prove beyond a reasonable doubt that the defendants either participated in this combination or conspiracy with the purpose of producing anti-competitive effects or that the defendants participated in the combination or conspiracy with knowledge that this agreement would produce anti-competitive effects and these effects actually were produced.*

> The word "knowingly" as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident. The purpose of adding the word "knowingly" is to ensure that no defendant will be convicted for an act done because of inadvertent accidents or other innocent reasons. *If a defendant's act, knowingly done, resulted in an agreement of the type forbidden by the Sherman Act, such as an agreement to rig bids, the element of intent is established.* It is also unnecessary for the government to prove that the defendants knew that the agreement, combination or conspiracy to allocate the construction project or to rig bids was a violation of the law.

Joint Appendix at 219–221 (emphasis added).

The appellants object to the court's statement that the element of intent is established if the "defendant's act, knowingly

---

**9.** This suggested instruction is obviously based on appellants' argument that there was no agreement between Crain & Denbo and Brinkley to restrain trade because Crain & Denbo had unilaterally decided not to compete for Contract 12. We again reject this argument and any instruction based thereon.

done, resulted in an agreement ... to rig bids." Joint Appendix at 220. They contend that this statement essentially nullified the earlier portion of the court's instruction that the Government must prove the appellants' knowledge or purpose concerning the anti-competitive effects of the conspiracy and thereby removed from the jury the duty to find that appellants intended to produce such effects. They argue, therefore, that the district court's instructions contravene the decision of the Supreme Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), which holds that the intent element in criminal antitrust actions must be proved and cannot be presumed. We reject this argument, as we are required to do by prior decisions of this circuit.

 In *United States v. Society of Independent Gasoline Marketers*, 624 F.2d 461 (4th Cir.1979), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981), this court declined to apply *Gypsum* in a case in which the defendant's conduct constituted a *per se* violation of the Sherman Act. In his opinion for the court, Judge Field explained that the conduct in *Gypsum* concerned price verification, a practice not regarded as a *per se* antitrust violation. "Since in a price-fixing conspiracy the conduct is illegal *per se*, further inquiry on the issues of intent or the anti-competitive effect is not required. The mere existence of a price-fixing agreement establishes the defendant's illegal purpose since '[t]he aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition.'" *United States v. Society of Independent Gasoline Marketers*, 624 F.2d at 465 (citations omitted). Thus, the

holding in *Gypsum* concerning proof of intent does not apply in the same manner in cases involving a *per se* violation, as it does in rule of reason cases.

In *United States v. Smith Grading and Paving, Inc.*, 760 F.2d 527 (4th Cir.), *cert. denied sub nom., Dellinger, Inc. v. United States*, —— U.S. ——, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985), this court recently reaffirmed its position concerning the intent that must be shown in *per se* cases. The defendants in *Smith* were charged, as were the defendants in the present case, with bid rigging in violation of Section 1 of the Sherman Act. Rejecting a challenge to an instruction similar to the instruction given in this case, we held that "this circuit recognizes *per se* antitrust violations. Therefore, the trial court correctly instructed the jury that the government must prove the defendants' intentional participation in the conspiracy to rig bids. The government did not have to prove the defendants' specific intent to unreasonably restrain trade." *Id.* at 533.[10]

### V.

 We find that the trial court's instructions in this case constituted an accurate statement of the law concerning the requisite intent in cases involving *per se* violations of antitrust law. We therefore find no error on the part of the district court.

The convictions of the appellants are AFFIRMED.

---

**10.** Other circuits have considered the application of *Gypsum* in *per se* cases and have reached the same conclusion as this circuit. *See United States v. Koppers Co., Inc.*, 652 F.2d 290, 295–96, n. 6 (2nd Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981) ("Where *per se* conduct is found, a finding of intent to conspire to commit the offense is sufficient; a requirement that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the *per se*

rule is designed to avoid."); and *United States v. Brighton Building and Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979) ("We do not read *Gypsum* as indicating that once defendants are proved to have intentionally made an agreement which is unlawful *per se*, there must be an instruction that the defendants cannot be convicted unless they are found to have intended to restrain trade or commerce.").