2012 CO 46

**Betty G. AMOS and the Estate of Thomas R. Righetti, Petitioners**

v.

**ASPEN ALPS 123, LLC, and Equitable Bank, Respondents.**

**No. 10SC187.**

Supreme Court of Colorado, En Banc.

June 18, 2012.

Rehearing Denied July 30, 2012.

Holland & Hart, LLP, Wiley E. Mayne, Steven T. Collis, Denver, Colorado, Holland & Hart, LLP, Christopher J. Heaphey, Aspen, Colorado, Attorneys for Petitioners.

Garfield & Hecht, P.C., Matthew C. Ferguson, Christopher D. Bryan, Aspen, Colorado, Attorneys for Respondent, Aspen Alps 123, LLC.

Duncan, Ostrander & Dingess, P.C., Richard F. Rodriguez, James Birch, Denver, Colorado, Attorneys for Respondent, Equitable Bank.

Justice RICE delivered the Opinion of the Court.

¶ 1 In this appeal, we address whether a failure to strictly comply with C.R.C.P. 120's notice requirements mandates setting aside a completed foreclosure sale. We conclude that when the parties received actual notice which afforded them an opportunity to present their objections and no prejudice resulted, we will not disturb a completed foreclosure sale. Accordingly, we affirm the court of appeals' judgment with respect to Rule 120 notification.

¶ 2 We also examine whether the principals of Aspen Alps 123, LLC (Aspen Alps) engaged in bid rigging in violation of the Colorado Antitrust Act, section 6–4–106, C.R.S. (2011). We determine that the limited record before us fails to establish bid rigging and, therefore, we reverse the court of appeals on the issue of bid rigging.

## I. Facts and Proceedings Below

¶ 3 This case involves the public trustee foreclosure sale under C.R.C.P. 120 of a condominium unit in Aspen. Prior to the foreclosure sale, Betty Amos and her late husband, Thomas Righetti, owned the unit. Amos borrowed approximately $1.6 million from Equitable Bank securing the loan with a Deed of Trust on the condominium unit in favor of Equitable Bank and granted by Amos and Righetti.

¶ 4 In September 2002, Righetti died. Amos and Righetti's daughter, Brandy Righetti, were named as co-personal representatives of the Estate of Thomas Righetti.

¶ 5 In 2006, Amos' loan fell into default and Equitable Bank decided to foreclose on the property. Equitable Bank filed a Rule 120

Motion for Order Authorizing Sale and sent notice of the proceeding to Amos in her individual capacity. Equitable Bank did not send notice of the Rule 120 proceeding to the Estate or to Brandy Righetti. Neither Amos nor the Estate opposed the order authorizing sale.

¶ 6 The public trustee held a foreclosure sale on February 27, 2007. Neither Amos nor the Estate submitted a bid. After Equitable Bank bid the amount of its debt, three individuals—Seguin, Mayer, and Griffin (representing Flaum)—bid competitively until Seguin had bid $1.86 million. At that point, Griffin proposed to the others that, instead of "bidding the property up further and further," they cease bidding against each other and buy the property jointly. All agreed and formed Aspen Alps 123, LLC after the auction. The public trustee deemed Aspen Alps as the successful bidder. On August 14, 2007, the public trustee issued the deed quieting title in the property to Aspen Alps.

¶ 7 Amos then brought this action against the public trustee and Equitable Bank to enjoin the issuance of the deed to Aspen Alps, and to compel the trustee to allow her to redeem.[1] Concurrently, she filed a notice of lis pendens. When the trial court refused to grant a preliminary injunction in Amos' favor, she filed a second notice of lis pendens. Amos then amended her complaint to include a claim that Equitable Bank failed to strictly comply with the notice requirements of Rule 120.

¶ 8 Prior to trial, Amos also filed a summary judgment motion asserting that Equitable Bank failed to comply with the foreclosure procedure set forth in Rule 120. The trial court determined that Equitable Bank sent Righetti's notice to the wrong address and thus did not strictly comply with the Rule. Nonetheless, the trial court found that the error was a mere technicality and that

the plaintiffs failed to show any prejudice since they received actual notice. Accordingly, the trial court declined to declare the sale null and void.

¶ 9 Shortly before trial, Amos attempted to add a third claim alleging bid rigging, antitrust violations, and conspiracy by the principals of Aspen Alps. The trial court denied Amos' motion to amend, but allowed evidence of bid rigging as a defense to counterclaims [2] asserted by Aspen Alps.

¶ 10 The case proceeded to a trial to the court and the court dismissed Amos' redemption claim under C.R.C.P. 41(b). The trial court also determined that the principals of Aspen Alps had not engaged in illegal bid rigging and that both lis pendens filed by Amos were spurious documents and slandered title to the property.

¶ 11 Amos appealed. The court of appeals held that a foreclosing party must strictly comply with the notice requirements of Rule 120, but excused Equitable Bank's failure to send notice to Brandy Righetti or to the Estate. The court of appeals reasoned that Equitable Bank sent notice to Amos, a co-personal representative and agent of the Estate. Accordingly, because the Estate had constructive notice of the foreclosure and was not prejudiced, there was no basis for setting aside the foreclosure sale. The court of appeals also held that the principals of Aspen Alps had engaged in illegal bid rigging because their agreement to purchase the property together was anti-competitive. Consequently, it set aside the deed to Aspen Alps. The court of appeals did not, however, void the foreclosure sale. Instead, it remanded to the trial court with instructions for that court to exercise its equitable discretion to determine whether to award the deed to the high bidder or void the foreclosure sale.

---

1. Under Rule 120 in 2007, Amos had 75 days (until May 14, 2007) in which to redeem. She claimed that she sent an intent-to-redeem letter to the public trustee before the redemption deadline. The public trustee, however, never received the letter. On May 8, six days prior to the redemption deadline, Amos' attorney notified the public trustee of Amos' intent to redeem. And, on May 14, Amos wired the necessary funds to the public trustee. Aspen Alps, however, exer-

cised its statutory right to veto the redemption and directed the public trustee to deny Amos' attempt to redeem.

2. Aspen Alps asserted counterclaims, including, for declaratory judgment that Aspen Alps properly purchased the property at the foreclosure sale and that it held free and marketable title, and to quiet title in the property.

¶ 12 Amos sought certiorari review by this Court.[3] We now affirm the court of appeals' judgment with respect to the Rule 120 notice requirement, and reverse its decision with respect to bid rigging.

## II. Analysis

### A. Notice Requirement

¶ 13 First, we examine whether a failure to strictly comply with Rule 120's notice requirements mandates setting aside a completed foreclosure sale. We review a trial court's grant of summary judgment de novo. *A.C. Excavating v. Yacht Club II Homeowners Ass'n,* 114 P.3d 862, 865 (Colo. 2005). Summary judgment is appropriate when no issues of material fact exist and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *A.C. Excavating,* 114 P.3d at 865. The nonmoving party is entitled to the benefit of all favorable inferences that may be drawn from the undisputed facts, and all doubts as to the existence of a triable issue of fact must be resolved against the moving party. *A.C. Excavating,* 114 P.3d at 865.

¶ 14 C.R.C.P. 120 governs the process by which an interested person may request that a court enter an order authorizing the sale of real property when the power of sale is contained in a deed of trust to a public trustee. To request an Order Authorizing Sale, the interested person files a verified motion with the trial court. Rule 120 states that the motion "shall be accompanied by a copy of the instrument containing the power of sale, shall describe the property to be sold, and shall specify the default or other facts claimed by the moving party to justify invocation of the power of sale." The Rule further provides that in the instance of foreclosure of the real property secured by a deed of trust to a public trustee:

> the motion shall state the name and last known address, as shown by the records of the moving party, of the grantor of such deed of trust, of the current record owner of the property to be sold, and of any person known or believed by the moving party to be personally liable upon the indebtedness secured by the deed of trust, as well as the names and addresses of those persons who appear to have acquired a record interest in such real property, subsequent to the recording of such deed of trust and prior to the recording of the notice of election and demand for sale, whether by deed, mortgage, judgment or any other instrument of record.

C.R.C.P. 120(a). The Rule then provides a notice requirement which states that a copy of the motion shall be served "to each person named in the motion (other than persons for whom no address is stated) at the address or addresses stated in the motion." C.R.C.P. 120(b).

¶ 15 First, we hold that the trial court correctly found that Equitable Bank failed to strictly comply with Rule 120's notice requirements by serving Righetti at the wrong address. Amos and Righetti were the grantors of the Deed of Trust in favor of Equitable Bank. Equitable Bank mailed notice to the deceased Righetti at the address on the Deed of Trust, but that notice contained a typographical error so that the street address numbers were transposed, rendering the mail undeliverable. Pursuant to Rule 120 and the terms of the Deed of Trust, Equitable Bank was required to provide notice to Righetti at his last known address. Because Equitable Bank failed to do so, it did not strictly comply with the Rule.[4]

¶ 16 This brings us to the question before the Court on certiorari review: whether a completed foreclosure sale must be set aside for a failure to strictly adhere to Rule 120's notification requirements when actual notice was received. Jurisdictions across the country are divided as to whether

---

3. We granted review on the following issues:
   1. When bidders at a public foreclosure sale conspired to rig the bidding in violation of the Colorado Antitrust Act and the resulting deed is void, may the court nevertheless award the foreclosed property to one of the conspirators rather than void the sale?

2. Whether a foreclosing bank's material failure to comply with C.R.C.P. 120's requirements to identify and give notice to all interested parties voids the resulting foreclosure sale.

4. Equitable Bank does not claim to have mailed notice to the Estate or to Brandy Righetti.

the standard for foreclosure notification is actual notice or strict compliance.[5] This Court addressed public trustee foreclosure notice requirements in *Dews v. District Court,* 648 P.2d 662, 664 (Colo.1982), and found that the "provisions of Rule 120 must be strictly complied with by one seeking foreclosure under a power of sale through the public trustee." At issue in *Dews* was the fact that the Rule 120 foreclosure notices were not timely sent to the debtor. *Id.* at 663. Rather than being mailed at least 15 days prior to the proceeding as required by the Rule, the notices were mailed out 14 days prior to the proceeding. *Id.* As a result, the debtors received notice of the Rule 120 proceeding only two to three days before they were required to respond. *Id.* Due to the foreclosing party's failure to strictly comply with Rule 120's notice provisions and the resulting untimely notice, this Court voided the order authorizing the sale and required a new Rule 120 proceeding. *Id.* at 664. The question then is whether *Dews* requires a completed foreclosure sale be declared void due to a foreclosing party's failure to strictly comply with Rule 120. We do not read *Dews* to mandate such a result.

¶ 17 The petitioners urge this Court to void the completed foreclosure sale for a deviation from the notice requirement—namely, that the notice was addressed only to Amos individually and not to Amos individually and as personal representative of Righetti's Estate—when they had actual notice of the Rule 120 hearing and pending foreclosure, and where the foreclosing party and trustee otherwise fully complied with Rule 120. We decline to do so. When, as here, a procedural irregularity did not injure or harm the complaining party, a foreclosure sale will not be set aside. "Notice should further the purposes of the requirement: 'to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Lehner v. United States,* 685 F.2d 1187, 1191 (9th Cir.1982) (citing *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Rule 120's requirement to provide notice to all interested persons was devised to provide *actual notice* to those with an interest in the pendency of the action and afford them an opportunity to be heard. Charles D. Calvin, Legislative History: C.R.C.P. Rule 120, 8 Colo. Law. 785, 788 (1979) (citing *Mullane,* 339 U.S. at 314, 70 S.Ct. 652). Rule 120's notice provisions are fashioned to ensure that notice is timely. *Dews,* 648 P.2d at 664. In addition, Rule 120 ensures that the hearing provides the allegedly defaulting party an opportunity to be heard at a meaningful time and in a meaningful manner concerning the matters constituting the alleged defaults. *Id.*

¶ 18 Here, it is undisputed that Equitable Bank provided notice to Amos at her last known address—the same address at which the Estate received correspondence. It is also undisputed that Amos received that notice. The record additionally establishes that Amos served as the co-personal representative of the Estate. Therefore, the Estate—with Amos as a personal representative—received constructive notice of the foreclosure through the actual, timely notice provided to Amos. *See* C.R.C.P. 4(e)(4). Upon receiving notice of the Rule 120 proceeding, Amos forwarded the notice to her attorneys who, together with Amos, chose not to chal-

---

5. *Compare Long v. Bd. of Governors,* 117 F.3d 1145, 1158 (10th Cir.1997) ("To establish a due process violation, an individual must show that he or she has sustained prejudice as a result of the allegedly insufficient notice."); *Baker v. Latham Sparrowbush Assocs.,* 72 F.3d 246, 254 (2d Cir.1995) ("If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."); *Lyon v. Estate of Cornell,* 269 A.D.2d 737, 738, 703 N.Y.S.2d 325 (N.Y.App.Div.2000) ("Once actual notice is received, strict compliance with the statute is no longer required."); *Amresco Independence Funding, Inc. v. SPS Props., LLC,* 129 Wash.App. 532, 119 P.3d 884, 886–87 (2005) ("Despite the strict compliance requirement, a plaintiff must show prejudice before a court will set aside a trustee sale."), with *Ameribank, N.A. v. Quattlebaum,* 269 Ga. 857, 505 S.E.2d 476, 478 (1998) (strict compliance required even though "departure may not result in injustice in this case"); *Sec. Pacific Fin. Corp. v. Bishop,* 109 Idaho 25, 704 P.2d 357, 359 (Idaho Ct.App.1985) (strict compliance with deed of trust foreclosure statutes required); *Equivest Ltd. P'ship v. Foster,* 253 Mich.App. 450, 656 N.W.2d 369, 374 (2002) ("We ... feel constrained to" require strict compliance with tax sale notice provisions, "even if doing so produces anomalous results.").

lenge the default. Thus, Amos, and thereby the Estate, was afforded timely notice and a meaningful opportunity to appear and defend the foreclosure action.[6]

¶ 19 The instant case differs from *Dews* which came before this Court on a C.A.R. 21 petition before a foreclosure sale had occurred. 648 P.2d at 662–63. Moreover, the allegedly defaulting party in *Dews* received notice only days before the proceeding and therefore was not given timely notice or afforded a meaningful opportunity to be heard. *Id.* at 664.

¶ 20 Here, the failure to provide notice to Righetti as required under Rule 120 did not result in harm to Righetti or his Estate. Amos and the Estate had sufficient notice of the Rule 120 proceeding and could have chosen to defend the foreclosure action. Instead, after consulting with counsel, Amos made an informed decision not to contest the default on her own behalf or on behalf of the Estate. To determine that the notice fails here because it was addressed only to Amos individually and not to Amos individually and as personal representative of Righetti's Estate would ignore the purpose underlying notice: "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. We will not elevate form over substance and void a completed foreclosure sale at this late juncture when the Estate had constructive notice, made no timely objection to the Rule 120 hearing, and no injury resulted. Thus, we affirm the court of appeals with respect to its Rule 120 determination.

**B. Bid Rigging**

¶ 21 We now turn to the issue of bid rigging.[7] First, we describe the unusual procedural posture of this case. Next, we discuss what constitutes bid rigging under the Colorado Antitrust Act, taking guidance from the Sherman Act. Finally, we determine that the trial court's findings and conclusion that the plaintiffs failed to prove bid rigging as a defense are supported by the record.

**1. Procedural History**

¶ 22 This issue comes before the Court in an unusual procedural posture. A party may bring a civil claim under the Colorado Antitrust Act to recover damages for bid rigging. *See* § 6–4–114, C.R.S. (2011).[8] Here, the trial court denied the plaintiffs' motion to amend their complaint a third time to include a claim for bid rigging. The trial court reasoned that the plaintiffs had unduly delayed adding the potential claim, and failed to show good cause for amending their complaint only forty-five days before trial and after the close of discovery. Further, the trial court found that prejudice could result from the introduction of the claim so close to trial, and from the lack of discovery on bid rigging.

¶ 23 The trial court did, however, permit plaintiffs to present evidence of bid rigging as a defense to Aspen Alps' counterclaims despite acknowledging that the plaintiffs were attempting "to admit evidence of bid rigging through the back door." The trial court allowed the defense, finding that the evidence was relevant because in order to

---

**6.** The petitioners challenge the trial court's finding that the Estate and Brandy Righetti were not entitled to notice under Rule 120. Even assuming that C.R.C.P. 120 required Equitable Bank to provide notice to the Estate or to Brandy Righetti as co-personal representative of the Estate, we would reach the same result because the Estate received constructive notice through the actual notice provided to Amos. Thus, the same lack of prejudice analysis would apply.

**7.** The parties disagree about whether the issue of bid rigging is before the Court, or whether we are confined to the issue on which we granted certiorari review: whether, when bidders at a public foreclosure sale conspired to rig the bidding in violation of the Colorado Antitrust Act

and the resulting deed is void, the foreclosed property may be awarded to one of the conspirators rather than void the sale. This Court has the authority to review issues encompassed within the certiorari issue. C.A.R. 53(a)(1) ("The statement of an issue presented will be deemed to include every subsidiary issue clearly comprised therein."). Here, the issue of whether bid rigging occurred must be resolved to reach the issue on certiorari.

**8.** The statute provides a civil private right of action for violation of the Act in section 6–4–114: "Any person injured in its ... property by reason of any violation of this article may sue therefor and, if successful, shall recover any actual damages sustained by such person."

recover on its counterclaims, Aspen Alps would need to establish valid title to the property. Though valid title is presumed when, as here, title is conferred by the official act of a public official, the trial court determined that evidence of bid rigging could rebut the presumption. Therefore, the trial court determined, bid rigging could be introduced as a defense. Even so, the trial court did not allow the plaintiffs to reopen discovery to further develop the defense, determining that the plaintiffs "could have and should have discovered this defense long before." Instead, the trial court only permitted the plaintiffs to designate previously taken deposition testimony from Mayer, one of the parties bidding at the auction, and from Tiffany Wincura, Public Trustee of Pitkin County. Thus, bid rigging was introduced as only a defense, late in the case, with limited discovery.

¶ 24 With this limited record before it, the court of appeals determined that bid rigging had occurred. The court of appeals then relied on section 6–4–121, C.R.S. (2011),[9] to reverse the quiet title decree, but declined to void the foreclosure sale. Instead, the court of appeals remanded the case to the trial court to determine in its equitable discretion whether the sale should be void or if the high bidder at the foreclosure sale should be awarded the deed to the property. We reverse.

### 2. Standard of Review

¶ 25 In an appeal of a judgment entered after a trial to the court, we defer to the trial court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and are not supported by the record. C.R.C.P. 52; *Ranta Constr., Inc. v. Anderson,* 190 P.3d 835, 843 (Colo.App.2008). When the facts are undisputed, the reviewing court will not defer to the trial court's factual findings, but will instead conduct a de novo review and make an independent judgment on the merits. *Hino-*

jos v. Lohmann, 182 P.3d 692, 694–95 (Colo. App.2008).

### 3. Requirements for Bid Rigging

¶ 26 The Colorado Antitrust Act prohibits bid rigging under section 6–4–106: "(1) It is illegal for any person to contract, combine, or conspire with any person to rig any bid, or any aspect of the bidding process, in any way related to the provision of any commodity or service." The term "commodity" includes land and real property. § 6–4–103, C.R.S. (2011).

¶ 27 There are no cases in Colorado interpreting section 6–4–106. We therefore look to federal antitrust cases as our guide when interpreting the Colorado Antitrust Act. § 6–4–119, C.R.S. (2011) ("It is the intent of the general assembly that, in construing this article, the courts shall use as a guide interpretations given the federal courts to comparable federal antitrust laws."); *People ex rel. Woodard v. Colo. Springs Bd. of Realtors, Inc.,* 692 P.2d 1055, 1061 (Colo.1984) ("[B]ecause our statute is intended to protect the public from illegal restraints of trade beyond the reach of federal law, decisions of federal courts construing the Sherman and Clayton Acts, although not controlling, are entitled to careful scrutiny in resolving issues arising under Colorado's antitrust statute."). The Sherman Act differs from Colorado's Antitrust Act in that the federal law does not contain a provision specifically prohibiting bid rigging. *Compare* 15 U.S.C. § 1 (2006) ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal."), *with* § 6–4–106. Nonetheless, a federal body of case law exists interpreting the Sherman Act to prohibit bid rigging, and classifying bid rigging as a per se violation of section 1 of the Act. *See, e.g., United States v. Koppers Co.,* 652 F.2d 290, 294 (2d Cir. 1981); *United States v. Bensinger Co.,* 430 F.2d 584, 589 (8th Cir.1970); *Love v. Basque Cartel,* 873 F.Supp. 563, 576 (D.Wyo.1995).

9. Section 6–4–121 provides:
   All contracts or agreements made by any person while a member of any combination, [or] conspiracy ... prohibited under this article which are founded upon, or are the result of, or grow out of, or are connected with any violation of this article, either directly or indirectly, shall be void, and no recovery thereon or benefit therefrom shall be had by or for any such person. . . .

¶ 28 Thus, we look to federal cases involving bid rigging as a guide to our determination of what constitutes bid rigging. Most of the federal cases involving bid rigging arise as criminal prosecutions that do not involve real property. *See, e.g., United States v. Reicher,* 983 F.2d 168 (10th Cir.1992) (reviewing a criminal prosecution under the Sherman Act for bid rigging); *United States v. W.F. Brinkley & Son Constr. Co.,* 783 F.2d 1157 (4th Cir.1986) (same); *United States v. Lyons,* 670 F.2d 77 (7th Cir.1982) (same). We have some guidance, however, from two cases involving claims of bid rigging in foreclosure sales: *United States v. Guthrie,* 814 F.Supp. 942, 943 (E.D.Wash.1993), and *Love v. Basque Cartel,* 873 F.Supp. at 563.

¶ 29 In *Guthrie,* Guthrie was convicted under the Sherman Act for rigging bids at two real estate foreclosure sales. 814 F.Supp. at 943. Guthrie approached potential bidders prior to the scheduled foreclosure sales and requested that they forego bidding at the sale in return for payment. *Id.* at 943–44. Guthrie was subsequently the only bidder at the foreclosure sales and won by submitting a bid $1 above the minimum bid level. *Id.* at 944. The court determined that Guthrie had engaged in bid rigging, which it defined as "an agreement between two or more persons to eliminate, reduce, or interfere with competition for a job or contract that is to be awarded on the basis of bids." *Id.* at 950.

¶ 30 In *Love,* the court dismissed claims of bid rigging cautioning that "[b]id rigging should not be confused with joint bidding, which allows bidders to pool their resources to place bids on property which they would otherwise be unable to afford." 873 F.Supp. at 577. The plaintiffs asserted that bid rigging occurred when a group agreed to buy an entire property for a set price rather than buying the parcels the members of the group had originally tried to obtain. *Id.* at 577–78. Because the defendants joined to purchase the property in its entirety, the plaintiffs asserted that the defendants were able to purchase the entire property for an artificially low price. *Id.* at 578. The court rejected the argument, determining that "its adoption would essentially outlaw joint bids of any kind since it could always be said that joint bidding agreements removed potential bidders from the bidder pool and thus suppressed competition." *Id.* The court also considered the fact that the plaintiffs failed to present evidence that they or anyone else were foreclosed from bidding. *Id.*

¶ 31 The *Love* court also relied on *Kearney v. Taylor,* 56 U.S. 494, 520, 15 How. 494, 14 L.Ed. 787 (1853), to find the bidders conduct "consonant with the Supreme Court's support for joint bidding." *Love,* 873 F.Supp. at 578. In *Kearney* the United States Supreme Court announced that joint bidding is necessary and even desirable:

> The property at stake might be beyond the means of the individual, or might absorb more of them than he would desire to invest in the article, or be of a description that a mere capitalist, without practical men as associates, would not wish to encumber himself with.

56 U.S. at 520. Thus, the Court reasoned that it must "look beyond the mere fact of an association of persons formed for the purpose of bidding at this sale, as it may be not only unobjectionable, but oftentimes meritorious, if not necessary, and examine into the object and purposes of it." *Id.* at 520–21. If the purpose of the association is not to prevent competition, but to enable or induce those in the association to participate in the bidding, then the sale should be upheld. *Id.* at 521.

¶ 32 With this guidance in mind, we turn to the issue of bid rigging in the case at hand.

#### 4. Application

¶ 33 In this case, the trial court concluded that the plaintiffs failed to establish bid rigging as a defense. Rather, the three individual bidders exercised their right to contract by pooling their resources to place bids on a property which they would otherwise be unable to afford. *See Love,* 873 F.Supp. at 577. The trial court based its conclusion on several key findings of fact. First, Seguin, Mayer, and Flaum (via Griffin) were each unable to individually bid any higher than the $1.86 million winning bid at the foreclosure sale. Mayer ceased bidding before the three decided to form the LLC because the bid surpassed her available funds. Similarly, Flaum testified that $1.8

million was the maximum amount of authority that Griffin had to bid. Seguin's bid of $1.86 million was the highest bid and was offered before the agreement to stop bidding and form Aspen Alps to jointly buy the property was made. In addition, the plaintiffs failed to establish that any competitors were shut out of the bidding process as Mayer, Seguin, and Flaum were the only bidders. Based on these findings of fact, the trial court concluded that the actions constituted joint bidding, not bid rigging. Consequently, the trial court held that the plaintiffs failed to establish bid rigging as a defense. We agree.

¶ 34 Because of the late introduction of the bid rigging theory and the lack of discovery on the issue, the plaintiffs offered extremely limited testimony regarding bid rigging. Evidence at trial established that only three people bid at the foreclosure sale: Mayer, Seguin, and Griffin (on behalf of Flaum). Unlike the defendant in *Guthrie,* the three did not know each other before the day of the foreclosure sale. Also, the three bid competitively. Mayer stopped bidding at $1.75 million because she did not have any more funds available to bid. Flaum authorized Griffin to bid only up to $1.8 million. Seguin submitted the high bid at $1.86 million. The final bid was also significantly higher than the starting bid of $1.495 million. Mayer testified that it was at that point in the bidding that Griffin said "we could be bidding this up further and further," and suggested that the three form Aspen Alps to purchase the property instead of bidding against one another.[10] The Pitkin County Public Trustee, Tiffany Wancura, testified that Mayer, Griffin, and Seguin decided to form Aspen Alps and purchase the property together rather than continue to bid against each other. While a prior agreement is not necessary to prove bid rigging, based on this testimony, we can conclude that, unlike in *Guthrie,* there was not an agreement prior to the foreclosure sale to rig the bid.

¶ 35 Moreover, this case resembles *Love* and *Kearney* in that testimony shows that Mayer, Griffin, and Seguin pooled their resources to purchase the property. The bid-

ding had exceeded Mayer's funds as well as Griffin's funds. Then Griffin proposed joint ownership of the property. In examining the purpose of the combined bid, we cannot say based on the limited evidence in the record that the purpose of the individuals joining to purchase the property was to eliminate, reduce, or interfere with competition. Thus, the record does not support a determination that bid rigging occurred.

¶ 36 As such, the record supports the trial court's determination that bid rigging was not established; therefore, we find no reason to disturb the judgment on appeal. Consequently, we reverse the court of appeals.

### III. Conclusion

¶ 37 For the foregoing reasons, we affirm the court of appeals' judgment with respect to Rule 120 notification. We reverse the court of appeals on the issue of bid rigging.

Chief Justice BENDER concurs in part and dissents in part.

Justice COATS dissents.

Chief Justice BENDER concurs in part and dissents in part.

¶ 38 The majority holds that unlawful bid rigging does not occur when all of the bidders in an ongoing foreclosure auction agree that "instead of 'bidding the property up further and further,' they cease bidding against each other and buy the property jointly." Maj. op. at ¶ 6. I disagree with this holding because I believe that this anti-competitive scheme was intended to stop further bidding and thus constitutes an illegal bid rigging conspiracy in violation of section 6–4–106(1), C.R.S. (2011). Thus, I respectfully dissent from Part II.B of the majority's opinion. However, because I agree with the majority's resolution of the Rule 120 notification issue, I concur in Part II.A. Hence, I concur in part and dissent in part.

### I.

¶ 39 The material facts in this case are undisputed. There were three principle bid-

---

10. The trial court admitted the statements under the CRE 801(d)(2)(E) hearsay exception.

ders[11] at the auction for the foreclosed condo below: Seguin, Mayer, and Griffin (representing Flaum). The three bidders bid competitively until Seguin bid $1.86 million. At that point, Griffin approached both Seguin and Mayer and proposed that rather than "bidding the property up further and further," they all stop bidding and instead agree to purchase the property jointly. Seguin and Mayer agreed and no further bids were submitted. After the auction, Seguin, Mayer, and Flaum formed Aspen Alps 123, LLC, and, shortly thereafter, the public trustee issued a deed quieting title to the real property in Aspen Alps.

## II.

¶ 40 Based upon these undisputed facts, I respectfully disagree with the majority's holding that bid rigging did not occur in this case. In the words of the bidders themselves, after the auction began, all of the bidders present at the auction unlawfully colluded to "stop the bidding process" and thus kept the sale price from rising "further and further." Accordingly, in my view, the parties engaged in an anti-competitive conspiracy in violation of section 6–4–106(1).[12]

¶ 41 "[A]n agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face." *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (quoting *United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969)). More specifically, an auction "will be set aside where a person, desirous of purchasing, prevents others by his improper conduct from bidding against him...." 7A C.J.S. *Auction & Auctioneers* § 14 (1980). Because bid rigging is per se unlawful, the relevant inquiry is whether an agreement existed to rig the bid, and not whether the agreement was successful. *United States v. Guthrie*, 814 F.Supp. 942, 949 (E.D.Wash. 1993).

¶ 42 The majority reasons that the bidders' agreement did not constitute unlawful bid rigging, but was instead lawful "pooling" of the bidders' resources to create a joint bid similar to the arrangement that the Wyoming Federal District Court found to be lawful in *Love v. Basque Cartel*, 873 F.Supp. 563 (D.Wyo.1995). Maj. op. at ¶ 33. Specifically, the *Love* court warned that "[b]id rigging should not be confused with joint bidding, which allows bidders to pool their resources to place bids on property which they would otherwise be unable to afford." 873 F.Supp. at 578. I disagree with the majority's reliance on *Love* because that case is easily distinguished from the present matter.

¶ 43 In *Love*, the court based its ruling that the joint bidding agreement constituted lawful bid pooling on three reasons. First, the *Love* court was persuaded by the fact that the parties to the joint bidding agreement were never in competition because each was only interested in owning a distinct parcel of the larger ranch that their joint bid succeeded in winning. *Id.* at 577–78. Second, the *Love* court reasoned that it was significant that the was no evidence that others that were present at the auction were prevented from matching or exceeding the joint bidders' final bid. *Id.* at 578. Finally, the Love court held that the agreement constituted lawful joint bidding because the evidence showed that in the absence of the joint bidding agreement, the reserve would not have been met for several of the parcels and therefore the auction would have failed. *Id.* at 579.

¶ 44 Each of these rationales is inapplicable to the auction in this case. First, there was only one parcel, the condo, and all three bidders were bidding competitively against one another to obtain the property in its entirety. Second, unlike in *Love*, where there were other bidders that may have competed against the joint bidders, here, all of the bidders present at the auction colluded to stop bidding. Their collusive behavior, which

11. The creditor bank, Equitable Bank, submitted an initial bid in the amount of its debt, which was then outmatched by the remaining bidders.

12. I agree with the majority that, under section 6–4–119, C.R.S. (2011), we must interpret section 6–4–106(1)'s prohibition on bid rigging consistent with federal antitrust law. Maj. op. at ¶ 27.

occurred while the auction was underway, destroyed any incentive among the bidders to match or to exceed the final bid. Finally, the reserve (or minimum bid amount) was met well before the parties conspired to stop bidding up the price of the auction. Thus, the success of the auction, in surpassing the reserve, was not contingent upon the parties' ability to submit a combined bid. Although I am mindful of *Love*'s warning that "[b]id rigging should not be confused with joint bidding," *id.* at 577, *Love* should not control this case. I acknowledge that, under certain circumstances, a combined bid may actually serve to foster competition by allowing joint bids to reach ever higher. In this case, however, the combined bid served to cut off all competition and, in the words of one of the bidders, "stop the bidding process."

¶ 45 Indeed, in direct contradiction to the facts in *Love*, the uncontroverted evidence here shows that the bidders did not come together to make the final, winning bid. Rather, after several rounds of bidding, Seguin, in his individual capacity, bid $1.86 million, and then, once that bid was submitted, Griffin (representing Flaum) approached Mayer and Seguin and "proposed to the others that, instead of 'bidding the property up further and further,' they cease bidding against each other and buy the property jointly." Maj. op. at ¶ 6. Unlike in *Love*, where, prior to the final round of bidding, the bidders pooled their bids to reach a price that they otherwise could not afford, here, Seguin could have afforded the final bid price independent of the financial contributions of the other bidders.

¶ 46 Seguin won the auction with his individual bid, and it was not until after the close of the auction that the parties came together to form Aspen Alps. At the time that their anti-competitive agreement occurred, Seguin held the high bid independent of the others. Thus, the incentive for him to join in the agreement was to prevent the auction price from getting bid up "further and further." Seguin was able to buy-off his competitors by agreeing to "form an LLC and stop the bidding process." In my view, their agreement represented a classic bid rigging scheme. It constituted an " 'agreement be-

tween competitors pursuant to which contract offers are to be submitted to or withheld from a third party.' " *Love*, 873 F.Supp. at 576 (quoting *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989), *cert. denied* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990)).

¶ 47 The majority reasons that this scheme did not constitute bid rigging because the non-winning bidders, Flaum (who was represented by Griffin at the auction) and Mayer, each provided self-serving testimony that they could not afford to match Seguin's final, winning bid. Maj. op. at ¶¶ 34–35. In my view, this misapprehends federal bid rigging jurisprudence, which has long recognized that the existence of a conspiracy to rig an auction is neither dependent on the success of the conspiracy nor on any showing that the agreement injured the seller by negatively impacting the final sale price. *See* ABA Section of Antitrust Law, *Model Jury Instructions in Criminal Antitrust Cases* 61 (2009) ("Bid Rigging"). Rather, the relevant inquiry is whether the "aim and result" of the conspiracy was "the elimination of one form of competition." *Id.* Thus, the sole issue in determining whether a joint bidding scheme constitutes unlawful bid rigging is whether it produces an anti-competitive result. In the present matter, the parties explicitly agreed to stop bidding to prevent the auction price from rising. This is the definition of anti-competitive behavior. *Id.* ("A conspiracy to rig bids may be an agreement among competitors about ... who should be the successful bidder ... or who should refrain from bidding ... that affects, limits, or avoids competition among them.").

¶ 48 Finally, I do not agree with the majority's implication that the fact that the bidders' agreement was made during—rather than before—the auction supports the conclusion that this scheme did not constitute bid rigging. Although the majority acknowledges that "a prior agreement is not necessary to prove bid rigging," maj. op. at ¶ 34, it nevertheless uses this fact to distinguish the present matter from *Guthrie*, in which the federal district court for the Eastern District of Washington denied a defendant's motion for judgment of acquittal on bid rigging

charges because the defendant had contacted other potential bidders and offered them money to refrain from participating in upcoming auctions. 814 F.Supp. at 943–44, 950. In my view, from a competitiveness standpoint, this case presents a more troublesome situation than existed in *Guthrie*. In *Guthrie,* because the alleged bid rigging occurred prior to the auctions, there was no guarantee that the defendant had bought off every potential bidder that might attend the auction. *See id.* at 943–44. In contrast, because the bidders' agreement in this case was not made until after the auction was already underway, the three bidders were assured that their agreement eliminated all competition.

### III.

¶ 49 I would hold that the bidders' agreement constituted unlawful bid rigging in violation of section 6–4–106 and proceed to address the remedy issue consistent with section 6–4–121, C.R.S. (2011), which, in my opinion, would void this unlawful transfer. Accordingly, I respectfully dissent from Part II.B of the majority's opinion.

Justice COATS, dissenting.

¶ 50 Unlike the majority I would not be so quick to relieve the Bank of its obligation to at least *substantially* comply with the statutory prerequisites for a court-authorized foreclosure sale. Even if I were to agree, however, that constructive notice bars a challenge to the validity of a foreclosure sale once it has already taken place, I would nevertheless disagree with the majority's imputation of notice to the Righetti Estate, under the circumstances of this case. Because I would void the judicial authorization and subsequent foreclosure sale in this case, without regard to the claim of bid-rigging, solely on the basis of a challenge by the not-yet-closed estate of a deceased tenant in common that went completely unidentified in the Bank's verified motion for authorization to proceed, I respectfully dissent.

¶ 51 I understand the majority to hold that a foreclosure sale will not be set aside for failure of the party seeking foreclosure to include an interested party of record in its motion for judicial authorization, as required by Rule 120 and section 38–38–105, C.R.S. (2011), as long as that interested party had constructive notice of the foreclosure proceeding but nevertheless failed appear and oppose the sale sometime before it actually took place. Without further analysis, the majority finds that the Righetti Estate had constructive notice of the foreclosure proceeding, apparently considering it self-evident that if Righetti's widow had actual notice, and she was a personal representative of the estate, then the estate must have been on constructive notice. Not only is this proposition *not* self-evident, I actually consider it to be erroneous, as a matter of law, or logic, or both.

¶ 52 Apparently agreeing that an inference of notice to the estate and its beneficiaries could hardly be considered self-evident, the court of appeals attempted to justify it by expressly reasoning that as a fiduciary a personal representative is also an agent, whose knowledge is imputed to her principal according to accepted principles of agency law. While an agency is a fiduciary relationship in which the agent has fiduciary obligations to his principal, it is not necessarily the case, however, that a fiduciary relationship also involves an agency relationship. Whether a fiduciary is additionally the agent of his principal depends entirely on the circumstances of the particular relationship and involves a separate legal inquiry. Restatement (Third) of Agency § 1.01 cmt. g (2006). By way of example, the Comments to the Restatement make clear that "a trustee is not an agent of the settlor or beneficiaries unless the terms of the trust subject the trustee to the control of either the settlor or the beneficiaries. Principals in agency relationships have power to terminate authority and thus remove the agent; trust beneficiaries, in contrast, do not have power to remove the trustee." *Id.*

¶ 53 Not only, therefore, is it erroneous to assume that a fiduciary relationship is necessarily governed by agency principles, but the close analogy between estates and trusts militates against finding an agency relationship in the former, any more than in the latter, in the absence of express provisions of a statute or will to the contrary. As with a trustee,

heirs or devisees lack the power to terminate a personal representative, in the absence an express provision of the will, and by statute in this jurisdiction, the liability of a personal representative for breach of his fiduciary duties is precisely the same as that of "a trustee of an express trust." § 15–12–714, C.R.S. (2011). While a trustee, or personal representative, by the very nature of a fiduciary relationship, has a heightened duty of care to beneficiaries of the trust or will, it would literally stand the relationship on its head to conclude that the beneficiaries are for that reason alone also liable to third parties for the fiduciary's action or inaction.[13]

¶ 54 In any event, Righetti's widow was not the personal representative of the Righetti Estate but merely a co-representative, along with the decedent's daughter. By statute, co-representatives do not independently have the powers of a personal representative but rather share those powers, which must be exercised cooperatively, with the consent of the other co-representatives. § 15–12–717. Because the statute expressly bars one co-representative from exercising the power of an agent to bind the estate with regard to the administration or distribution of estate property, it is not clear to me that a lone co-representative retains any greater power to waive interests of the estate. Even if I agreed with the majority that a foreclosure sale should not be voided merely because an interested party with actual notice of the proceedings was not designated, as statutorily required, in the motion for judicial authorization, I would still not decline to void this particular sale.

¶ 55 The majority's exclusive focus on notice, however, points to an even more fundamental objection to its rationale. From both its explanation and the authorities on which it relies, it appears that the majority is concerned only that the minimum notice requirements of procedural due process were satisfied. By contrast, not only do I not believe the notice requirements of our statute and rule are designed to ensure only this minimal degree of notice, I do not even consider notice the sole concern of our insistence on judicial authorization as a prerequisite to the exercise of a power of sale.

¶ 56 In this jurisdiction, before a public trustee may conduct a foreclosure sale, the holder of the evidence of debt must obtain a court order complying with C.R.C.P. 120. In addition to providing notice, that rule requires the filing of a verified motion in the district court stating the names and addresses of the various interested parties and anyone liable upon the secured indebtedness. *Id.* Before the motion may be granted, the court must examine it and be satisfied that the moving party is entitled to an order authorizing a sale on the facts. *Id.* Any sale held without an order issued in compliance with the statute and rule is statutorily declared invalid. *See* § 38–38–105(2)(a), C.R.S. (2011).

¶ 57 In this case, the Bank not only failed to serve the estate, whose representative the Bank knew to stand in the shoes of the decedent debtor and owner by tenancy in common of the subject property; perhaps even more importantly, it failed to designate the estate as a necessary interested party in its verified motion for court authorization, as required by Rule 120. Without being made aware that the decedent's widow was not the sole owner through a right of survivorship, as implied by the motion naming only her, and instead that the decedent's half interest in the property would pass through his estate to unnamed beneficiaries, the district court

13. To the extent the majority's "see" cite to the "Personal Service" provisions of C.R.C.P. 4 is intended to imply that a personal representative is a designated agent of her estate for purposes of service of process, I consider that suggestion not only mistaken but also irrelevant. As a general matter, the manner of presenting claims against an estate is prescribed at section 15–12–804, C.R.S. (2011), but proceedings to enforce a mortgage or other lien against property of an estate are expressly exempted from this provision and are governed instead by C.R.C.P. 120, which contains service requirements of its own, separate and distinct from those of Rule 4. In any event, Rule 4(e)(4) delineates persons upon whom delivery of process naming a particular entity will be considered adequate, not persons from whom notice of an ongoing proceeding will be imputed to that entity, regardless of adequate service. In this case, it is undisputed that neither the estate itself nor anyone in the capacity of personal representative for the estate was ever even named in the motion for a foreclosure sale, much less served with notice of the sale.

lacked the required information to assess the merits of the motion, as contemplated by statute and rule. While compliance with the dictates of the rule is clearly required for a valid sale by both statute and case law, regardless of the nature of the complaining party, it seems particularly ironic for the majority to excuse compliance with regard to an estate, statutorily subject to claims only upon written notice to, or litigation against, the personal representative, or filing with the clerk of the probate court, regardless of actual notice. *See In re Estate of Ongaro*, 998 P.2d 1097, 1100 (Colo.2000) (requiring compliance with section 15–12–804, notwithstanding the personal representative's awareness of a potential claim).

¶ 58 For one final touch of irony in this case, no reader of the court of appeals opinion below can fail to appreciate that the majority finds itself relieving the Bank of its obligation to comply with the requirements of Rule 120 for failure of any demonstration of prejudice only because the decedent's widow, who produced the required payment to the public trustee within the statutory redemption period, was held strictly, without any required showing of prejudice, to compliance with an additional 15–day notice requirement, which she missed by some 9 days.

¶ 59 Because I believe there has always been and yet remains very good reason for validating a foreclosure sale by the public trustee only upon compliance with the express procedural requirements of the rule and a valid court order, I would not abandon those requirements at all, much less in a case such as this. I therefore respectfully dissent.

